## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RUSSELL HEBERT, JR. and MARGARET HEBERT, on behalf of themselves and all others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Department of Homeland Security;<br><br>DEPARTMENT OF HOMELAND SECURITY;<br><br>DEANNE CRISWELL, in her official capacity as Administrator of the Federal Emergency Management Agency;<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY;<br><br>FEDERAL INSURANCE AND MITIGATION ADMINISTRATION;<br><br>DEFENDANTS. | CIVIL ACTION NO. _____<br><br>**CLASS ACTION COMPLAINT** |

## COMPLAINT

Plaintiffs, Russell Hebert, Jr. and Margaret Hebert ("Plaintiffs" and/or "Class Representatives") on behalf of themselves and all others similarly situated (the "Class"), bring this Class Action Complaint (the "Action") against the above-listed Defendants for violations of law. The allegations herein are made based on each Plaintiff's personal knowledge as to the allegations pertaining to themselves, and upon information, belief, and investigation by counsel as to all other matters.

**INTRODUCTION**

1.      In the middle of the 20th century, flood insurance was becoming increasingly unavailable in the United States. The private insurance industry was ill equipped to offer flood insurance on a national scale. Insurers lacked an actuarial basis for providing insurance, and people didn't want to purchase flood insurance, in part because of the costs. See Staff of Senate Comm. on Banking and Currency, 89th Cong., 2d Sess., *Insurance and Other Programs for Financial Assistance to Flood Victims* 98–99 (Comm. Print 1966) (report from Robert C. Weaver, Secretary of HUD).

2.      Congress responded by creating the National Flood Insurance Program ("NFIP"). Through the NFIP, made into law in 1968, Congress committed the federal government to "making flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection." 42 U.S.C. §4001(a). Congress "authorized" FEMA to create "a national flood insurance program" that "enable[s] interested persons to purchase insurance against" loss or damage to real or personal property "arising from any flood occurring in the United States." *Id*. § 4011(a). Congress directed FEMA to provide flood insurance at rates that, "insofar as practicable," are "consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance." *Id*. §4015(b)(2).

3.      The NFIP is now the primary source of flood insurance coverage for residential properties in the United States.

4.      To get people to participate in the program, the NFIP offered numerous incentives that would help lower insurance costs. It encouraged communities to adopt policies and laws to set minimum standards for elevation. It offered discounts to policyholders who undertook mitigation

efforts on their properties. And it offered stability to policyholders who were subject to unanticipated mapping changes, locking them in at their old premium through grandfathering.

5.    In 2020, the NFIP provided more than 5 million flood insurance policies and over $1.3 trillion in coverage, in 22,600 communities across the United States. It has long made large portions of the United States, including much of Louisiana, livable and affordable. Further, these policies have not only helped policyholders rebuild after a flood event but also have incentivized policyholders and the communities in which they reside to undertake significant mitigation efforts. Historically, flood-insurance rates have been lower for policyholders and communities that have undertaken those mitigation efforts.

6.    In 2021, FEMA turned the NFIP on its head and implemented the federal government's approach to flood insurance, which it called "Risk Rating 2.0—Equity in Action." The new "Equity in Action" approach to flood insurance "represents the biggest change to the way the NFIP calculates flood insurance premiums since the program began in 1968." Horn, A Brief Introduction to the National Flood Insurance Program, Cong. Research Serv., IF10988 (Jan. 4, 2023).

7.    This new FEMA methodology for calculating flood insurance rates unjustly and illegally causes most NFIP policyholder's premiums, including Plaintiffs' premiums, to dramatically increase. As such, the "Equity in Action" approach is now producing alarming results. Instead of making flood insurance more affordable, "Equity in Action" makes it less affordable—increasing premiums for almost all policyholders, sometimes by ten times or more over the next decade. Moreover, in fundamentally changing how it calculates rates for federal flood insurance, FEMA bypassed substantive and procedural legal requirements.

8.    Under Equity in Action, the agency ignores historical observed flood events and demonstrably effective mitigation efforts in favor of future flood hypotheticals to determine the

flood risk of each insured property. Those hypotheticals, in turn, determine how much a flood insurance policy is going to cost.

9.    Instead of more accurately reflecting actual flood-related risks, Equity in Action is making flood insurance much more expensive and appears to almost completely ignore crucial risk factors such as mitigation efforts—like the way levees and elevation reduce the likelihood of flood damage.

10.    Even in places that have never seen a flood, FEMA has raised premiums for flood insurance.

11.    Compounding these problems, it is difficult to ascertain the full extent of this fundamental change in calculating NFIP premiums because FEMA has failed to disclose its methodology and input data. FEMA has made available only (a) high-level summaries of the methodological changes and (b) the new insurance premiums themselves, which are dramatically more expensive. As explained below, policyholders know what their rates were before Equity in Action, but they don't know what their new yearly rate will be under Equity in Action until they receive their renewal notice. And then, they don't know what their full premium increase will be until they receive their Declaration Page after they have renewed their policy. But even at that point, how FEMA got from the old rates to the new ones is still shrouded in mystery.

12.    While FEMA claims to make the program more transparent, the program is anything but. *See* FEMA Updates Its Flood Insurance Rating Methodology to Deliver More Equitable Pricing, FEMA (Apr. 1, 2021), https://perma.cc/LEZ8-LTEP.

13.    Instead, "Equity in Action" will be enacted without notice and comment and based on secret decisions.

14.    Since FEMA implemented Equity in Action, the number of NFIP policies has dropped from 5 million to under 4.7 million policies, and policies will continue to decrease for the reasons outlined herein. See Reauthorization of the National Flood Insurance Program: Improving Community Resilience: Hearing Before the S. Committee on Banking, Housing, and Urban Affairs, 118th Cong. 2 (May 2, 2023) (statement of Carolyn Kousky) ("For those not mandated to purchase flood coverage, many will drop their flood coverage.").

15.    FEMA's fundamental changes to the NFIP flout federal law, are arbitrary and capricious, and were enacted illegally.

16.    "Equity in Action" injures the Plaintiffs, and this Court should hold it unlawful, enjoin its implementation and award damages.

17.    As such, Plaintiffs, individually, and on behalf of others similarly situated, bring this Action to seek adequate redress for the harm caused by Defendants' conduct.  Plaintiffs, and members of the putative class, seek compensatory and punitive damages, restitution, disgorgement, injunctive relief, reasonable attorney's fees and costs, and other relief arising from the conduct alleged in this complaint.

## PARTIES

### I.    PLAINTIFFS

18.    Plaintiffs are residents of, citizens of, and domiciled in Louisiana, who live in this State. Plaintiffs are owners of a home located at 100 Royal Street, Montegut, Louisiana 70377, and since 1972 Plaintiffs have owned and lived in that home.  Since 1972, Plaintiffs have been policyholders of the National Flood Insurance Program ("NFIP") – obtaining flood insurance coverage for their home at 100 Royal Street in Montegut, Louisiana ("Plaintiffs' Property") - and have suffered damages as a result of "Risk Rating 2.0—Equity in Action."  An exhibit and part of this complaint is the May 15, 2023 Declaration of Plaintiff Russell Hebert, Jr., including Exhibits A through F

attached thereto. Plaintiffs hereby adopt and incorporate by reference said May 15, 2023 Declaration of Russell Hebert, Jr. and Exhibits A through F attached thereto.

## II. DEFENDANTS

19.     Defendants are officials of the United States government and United States governmental agencies responsible for promulgating or implementing Risk Rating 2.0—Equity in Action.

20.     Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security. He oversees, among other things, the Federal Emergency Management Agency. He is sued in his official capacity.

21.     Defendant Department of Homeland Security is an executive department of the United States Government headquartered in Washington, D.C., and responsible for the Risk Rating 2.0—Equity in Action.

22.     Defendant Deanne Criswell is the Administrator of the Federal Emergency Management Agency. She is sued in her official capacity.

23.     Defendant Federal Emergency Management Agency is an agency within DHS that is headquartered in Washington, D.C., and administers Risk Rating 2.0—Equity in Action.

24.     Defendant Federal Insurance and Mitigation Administration is a subcomponent within the Federal Emergency Management Agency that is headquartered in Washington, D.C., and administers Risk Rating 2.0—Equity in Action.

**JURISDICTION AND VENUE**

25.     This Court has diversity jurisdiction pursuant to the Class Action Fairness Act, codified at 28 U.S.C. §§ 1332(d) and 1453, because the putative class consists of at least 100 Class Members; the citizenship of at least one Class Member is different from that of Defendants; and the amount in controversy exceeds $5 million, exclusive of interest and costs.

26.     This Court has federal question jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§1331, 1346, 1361; 5 U.S.C. §§701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. §§2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§2201-02, 5 U.S.C. §§701-06, and its inherent equitable powers.

27.     Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District and a substantial part of property that is the subject of this action is situated in this District.

## BACKGROUND

### I.     THE NATIONAL FLOOD INSURANCE PROGRAM.

28.     Congress created the National Flood Insurance Program in 1968 in the aftermath of Hurricane Betsy, which resulted in significant loss of life and property. This tragedy revealed the devastating consequences resulting from "the general unavailability of flood insurance from private insurers" for many Americans. Horn, *Private Flood Insurance and the National Flood Insurance Program*, Cong. Research Serv., R45242 (Jan. 9, 2023). "Private flood insurance was offered between 1895 and 1927, but losses incurred from the 1927 Mississippi River floods and additional flood losses in 1928 led most insurers to stop offering flood policies." *Id.* (citing National Research Council of the National Academies, Affordability of National Flood Insurance Program Premiums: Report 1, 23 (2015), https://perma.cc/SN9D-CW3R. The "withdrawal by private insurers from providing flood insurance coverage [left] flood victims largely reliant on federal disaster assistance to recover after a flood." *Id.*

29.     As a result, many Americans lost access to insurance and would be forced to either leave their communities and their homelands or risk personal financial ruin.

30.     Congress decided that rather than subjecting Americans to that fate, it would guarantee widely available flood insurance through the federal government. Congress provided that "as a matter of national policy, a reasonable method of sharing the risk of flood losses is through a program of flood insurance which can complement and encourage preventive and protective measures," and that the program should "be expanded as knowledge is gained and experience is appraised, thus eventually making flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection." 42 U.S.C. §4001(a). In other words, if you were an American who needed flood insurance, Congress promised to make sure you had it through the NFIP.

31.     Congress required the federal government to offer rates that, "insofar as practicable," are "consistent with the objective of making flood insurance *available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance*." 42 U.S.C. §4015(b)(2) (emphasis added). It also provided for specific reductions for properties built before 1974, 42 U.S.C. §4015(c), certain newly mapped properties, 42 U.S.C. §4015(i), and certain grandfathered plans, *Grandfathering*, March 2020, https://perma.cc/4AGT-2VKK.

32.     The NFIP also developed floodplain maps and standards for communities without floodplain maps. It requires communities to adopt and enforce certain management standards. If communities don't adopt and enforce these standards, then their homeowners will not be eligible for insurance. Key conditions of the NFIP minimum standards include requiring permits for developments in certain areas; requiring elevation of the lowest floor of all new residential buildings in certain areas; restricting development in the regulatory floodway to prevent increasing the risk of flooding; and require certain construction materials and methods that minimize future

flood damage. *See* 42 U.S.C. §4022(a)(1); 44 C.F.R. Part 60; FEMA, *NFIP Floodplain Management*, at https://perma.cc/G7JP-2665.

33.    The NFIP is funded from premiums, fees, and surcharges paid by NFIP policyholders; annual appropriations for flood-hazard mapping and risk analysis; borrowing from the Treasury when the balance of the National Flood Insurance Fund is insufficient to pay the NFIP's obligations (*e.g.*, insurance claims); and reinsurance if NFIP losses are sufficiently large.

34.    The NFIP is the primary source of flood insurance coverage for residential properties in the United States. At its height, it had more than 5 million flood insurance policies providing over $1.3 trillion in coverage, in 22,600 communities across 56 States and jurisdictions. Horn, *A Brief Introduction to the National Flood Insurance Program in the 118th Congress*, Cong. Research Serv., IN11049 (Jan. 12, 2023).

35.    FEMA manages the NFIP and is responsible for identifying flood hazards and communicating those hazards and associated risks to stakeholders. It undertakes Flood Insurance Studies ("FIS"), which analyzes flood hazards in certain communities, and produces Flood Insurance Rate Maps ("FIRMs") based on a variety of information.

36.    These FIRMs help determine flood insurance rates and dictate whether flood insurance needs to be mandatory in certain areas. They communicate flood risk information to the community and help manage expectations about flood insurance rates.

37.    In conducting each FIS, FEMA must consider all available information. This means that FEMA must engage with local officials, which it has traditionally done.

38.    Because FIRMs determine whether an individual is required to purchase flood insurance and what those flood insurance rates will be, FEMA historically has collaborated with State and

local entities, including levee districts to develop the FIRMS. In addition, FEMA provided a clear avenue for appeals of FIRM determinations.

39.    As part of FEMA's risk analysis, the agency considers the effectiveness of flood risk reduction systems like levees.

40.    If a levee system meets FEMA's requirements, the system becomes accredited and is deemed to reduce the risk of flooding. If FEMA determines the levee system doesn't meet its requirements, the system is non-accredited.

41.    If a levee system is unaccredited, though, FEMA historically has recognized that it still may add value and reduce risk. Thus, FEMA developed its Levee Analysis and Mapping Procedure, which provides the agency with more refined information about the impact of the levee system.

42.    Property owners, including Plaintiffs and members of the putative class, both residential and commercial, are required to purchase flood insurance if their property is identified as being in a Special Flood Hazard Area—which is equivalent to having an estimated 1% or greater risk of flooding every year—and is in a community that participates in the NFIP.

43.    In 2015, an estimated 15 million people lived in Special Flood Hazard Areas. Combining SFHAs with other areas exposed to flood risk, an estimated 30-40 million individuals—almost 10% of the United States population—live in areas with elevated risk of flooding. Others estimate 40.8 million people, or 12% of the population, are exposed to elevated flood risk.

44.    Property owners who do not obtain flood insurance may not be eligible for certain types of disaster assistance after a flood. 42 U.S.C §4012a(b); https://perma.cc/3S5A-CJFG.

45.    Property owners who have in the past obtained disaster relief are obligated to continue to hold flood insurance going forward.

46.     Property owners who have in the past obtained SBA loans are obligated to continue to hold flood insurance going forward.

47.     The NFIP is also interwoven with so many other requirements and programs that it is functionally mandatory for many homeowners.

48.     For example, federal agencies, federally regulated lending institutions, and government-sponsored enterprises must require certain property owners to purchase flood insurance as a condition of any mortgage that these entities make, guarantee, or purchase. This includes mortgages from banks insured by the Federal Deposit Insurance Corporation and mortgages backed by Fannie Mae or Freddie Mac, as well as federal entities such as the Federal Housing Administration and the Department of Veterans Affairs. *E.g.*, 42 U.S.C. §4012a. The mandatory purchase requirement is enforced by the lender, rather than FEMA, and lenders can be fined up to $2,000 by banking regulators for each failure to require flood insurance or provide notice.

49.     The NFIP is currently operating under its 25th short-term reauthorization, until September 30, 2023. P.L. 117-328.

**II.    RISK RATING 2.0—"EQUITY IN ACTION"**

50.     In April 2021, FEMA announced the change to the "pricing methodology" that it uses to set rates under the NFIP. *See FEMA Updates Its Flood Insurance Rating Methodology to Deliver More Equitable Pricing*, FEMA (Apr. 1, 2021), https://perma.cc/QF9V-V6MR.

51.     This new methodology went into effect on October 1, 2021, for all new policyholders and existing policyholders eligible for renewal and on April 1, 2022, for all remaining policyholders.

52.     FEMA called this new methodology "Risk Rating 2.0—Equity in Action."

53.     FEMA explained that it "devoted thousands of hours to develop the new pricing methodology." *Id.*

54.     It hired an outside company—Milliman—to develop the risk model used by the agency.

55.     After announcing implementation of this new program, FEMA updated its definition of "equity" to mirror the definition set forth in Executive Order 13985, entitled "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government." *See* FEMA Defines Equity in its Mission of Making Programs More Accessible, FEMA (Sept. 9, 2021). Under this Executive Order, agencies like FEMA must consider factors like race, ethnicity, religion, income, geography, gender identity, sexual orientation, and disability when issuing rules and guidance. Executive Order 13985 (Jan. 20, 2021). The agency confirmed it was "integrating equity" as defined by this Executive Order "into everything we do." *See* FEMA Defines Equity in its Mission of Making Programs More Accessible, FEMA (Sept. 9, 2021).

56.     On FEMA's website discussing "Risk Rating 2.0—Equity in Action," FEMA explains *why* it sought to make changes and what it was *not* changing, but FEMA does not provide much information about what it is changing.

57.     Elsewhere, FEMA broadly describes using certain factors to calculate premiums, but FEMA doesn't explain how those factors will impact premiums or what weight the agency gives each factor.

58.     For example, "Equity in Action" reviews where and how the property is built as well as the type of structure on the property. But the agency doesn't explain how it will weigh these factors or how these factors will impact insurance premiums. This injects uncertainty into the process for homeowners.

59.     Likewise, FEMA also says it considers the elevation of a structure, but it doesn't provide the model for determining how this elevation impacts premium rates, nor does it provide the input data. Again, this makes it impossible to predict what an insurance premium is going to look like until the policyholder receives the notice from the agency.

60.    "Equity in Action" employs a catastrophic loss modeling system, which takes into account hypothetical future events in evaluating risks. Previously, the agency looked at historical events and experiences. The agency fails to explain what hypothetical future events it is analyzing, and relying on such hypothetical and abstract possibilities results in widely divergent risk assessments as compared to other modeling systems.

61.    FEMA has refused to divulge the calculation methods behind these drastic price increases, instead sharing only general descriptions and technocratic jargon. Even the agents assigned with providing insurance policies under the new program do not know what effect any single data point has on a policy rate.

62.    For example, the public has no way of understanding what flood frequency probabilities FEMA used to determine the premium for the policyholder's property.

63.    The public also has no way of knowing whether these calculations are based on observed flood events, probabilities of future flood events, or some combination, nor is there any way to know precisely what those observations or probabilities are.

64.    FEMA has refused to share its statistical analysis underlying the rating factors, including the statistical method and its margin of error.

65.    The public has no way of reproducing these calculations elsewhere because FEMA has refused to provide information on its methodology.

66.    FEMA has not disclosed the deficiencies of existing NFIP premiums compared to estimated actuarial rates, which is necessary to understand the number of years required to achieve a "Equity in Action" actuarial rate.

67.    Under Risk Rating 2.0 ("RR2.0"), FEMA no longer uses the FIRMS, or the information provided through the Levee Analysis and Mapping Procedures process, for setting flood insurance rates.

68.    It is hard to imagine an agency action that would have more benefited from notice and comment. In developing "Equity in Action," Defendants made assumptions about millions of Americans' property, about important scientific questions, about mitigation measures, about the future, about homes, and about they would all interact. It decided to make millions of Americans' homes less affordable and potentially uninhabitable on a basis of these assumptions.

69.    But FEMA did not subject "Equity in Action" to notice and comment. It instead released only a series of informational documents about the policy, including a report on its methodology and data sources. *See National Flood Insurance Program Risk Rating 2.0 Methodology and Data Sources*, FEMA (Jan. 18, 2022), https://perma.cc/V8SD-KFJ7; *Risk Rating 2.0 State Profiles*, FEMA (Jan. 18, 2022), https://perma.cc/NKD9-2VF5; Flood Insurance Manual, NFIP (Oct. 2022), https://perma.cc/FDB4-SSUR. And then it put the new program into effect.

70.    It did not subject the new program to the mandatory OMB review process for all federal actions with a significant impact on the economy, which this plainly was. Executive Order 12866, *Regulatory Planning and Review*; 58 Fed. Reg 51735 (September 30, 1993).

71.    And it did not "consult with ... State, and local agencies having responsibilities for flood control, flood forecasting, or flood damage prevention" in considering and implementing the program. 42 U.S.C. §4024.

72.    The new methodology began governing the pricing of all new insurance policies starting on October 1, 2021, and all others upon their first renewal after April 1, 2022. *Id.* It portends devastating consequences.

73.    On April 19, 2023, FEMA released datasets that reveal the cost of flood insurance for single-family homes under RR2.0, comparing full-risk rates to current rates. But the datasets only included policies renewed before September 30, 2022. They did not include new policies or renewals written under RR2.0 after September 30, 2022. And this revelation came years after the information was requested.

### A. HIGHER PREMIUMS

74.    FEMA boasts that "[u]nder the new pricing system, 96% of current policyholders will see either an immediate decrease or $20 or less per month increase in their premiums." Federal Emergency Management Agency, Risk Rating 2.0: Equity in Action (Apr. 18, 2022), (Apr. 2021), https://perma.cc/V237-Q8UG. But immediately following this claim, FEMA reveals that it will in fact immediately increase costs for 77% of all homeowners. *Id.*

75.    Breaking this down further, according to NFIP's own estimates, under year one of "Equity in Action", 66% of all policyholders will be charged premiums up to $120 more per year for current coverage levels and 11% of policyholders charged annual premium increases ranging from $120 to $240. Federal Emergency Management Agency, Risk Rating 2.0: Equity in Action (Apr. 18, 2022), https://perma.cc/V237-Q8UG.

76.    This is even more pronounced for policyholders in Louisiana, where NFIP's own estimates project that 79.5% of policyholders will see an immediate premium increase. Risk Rating 2.0: Projected Premium Changes by State, Arcgis (last accessed Mar. 22, 2023), https://perma.cc/4S55-L24L.

77.    The projected average full-risk premium for a single-family home in Louisiana will increase 122%. Mike Smith, Flood insurance to rise 122% on average in Louisiana, data shows, NOLA.com (Aug. 27, 2022).

78.     The datasets FEMA released in April 2023 show even more devastating premium increases for those located in certain communities. For example, in some communities in St. Charles Parish, they will experience an average 752% increase in flood insurance, increasing from $784 to $6677. *See* Federal Emergency Management Agency, Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0 (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8. The average community in Plaquemines Parish will see a 545% increase in insurance rates. And some specific communities within Plaquemines Parish will experience an average 1098% increase, increasing from $635 to $5915.

79.     Every State will see increases under RR2.0, although these increases vary widely.

80.     Those cost increases are projected to compound over the coming decade. For example, 90% of Louisiana ratepayers subject to an increase in their flood insurance premiums can expect to see their annual cost increase by 18% per year for the next ten years. In practice, this means that a policy that was zoned to cost $572 per year in 2021 may eventually exceed $8,000 per year thanks to "Equity in Action."

81.     Ultimately, managing the rate of escalation of premiums does little to avoid the financial impact of the premium.

82.     While policies will continue to increase along a congressionally-mandated glidepath for many years, the few seeing decreases will only see the decrease one.

83.     To give a few examples of how "Equity in Action" will hit specific communities: Eighty-one percent of Orleans Parish NFIP policyholders will pay higher NFIP premiums under "Equity in Action," with 45,350 scheduled for first year rate increases of up to $120. According to FEMA data, 1,220 Orleans Parish policyholders will see premium reductions of up to $100 per month.

84.    These increased costs will lead to fewer policies in force and less coverage, creating greater risk exposure. NFIP's participation has already fallen in the past year, with some reports of a possible 20% reduction in participation due to the implementation of "Equity in Action"—even though the cost increases are just beginning. FEMA itself admitted to the Treasury Department that it expects one million or more NFIP policyholders to drop their NFIP coverage by the end of the decade as the result of "Equity in Action."

85.    NFIP reported a loss of 346,778 policies in force from December 31, 2021, to June 30, 2022.

86.    This number has decreased steadily as a result of Equity in Action.

87.    FEMA has predicted that it will lose 20% of its policyholders in the first 10 years because of Equity in Action.

88.    FEMA is simultaneously transferring more costs to policyholders while the number of policyholders among whom the cost is to be split continues to decline.

89.    These high premiums have a serious impact on Plaintiffs, the Class, and their communities.

90.    Upon information and belief, putative class members have already seen their annual flood insurance premiums rise unjustly and/or illegally as a result of Risk Rating 2.0.

91.    For example, with the implementation of Risk Rating 2.0, flood insurance rates for Class Representatives Russel Hebert, Jr. and Margaret Hebert have increased from $3,289.00 in 2021, to $5,611.00 in 2023, despite significant mitigation measures implemented.

    **B.  DEVALUED MITIGATION**

92.    Mitigation unquestionably reduces damage from floods.

93.    As a result of mitigation efforts, for example, the Terrebonne and Lafourche parishes only saw 11 homes flood during Hurricane Barry in 2019, compared to Hurricane Rita in 2005, which flooded 11,000 homes.

94.    When consumers receive mitigation discounts, they are more likely to undertake additional mitigation efforts.

95.    Sometimes these projects rely on federal or state funds. But when policyholders undertake their own mitigation, they use their own capital, rather than government funds.

96.    For example, North Lafourche Conservation Levee, and Drainage District ("NLCLDD") invested extraordinary funds in mitigation efforts, and its residents have voted to increase ad valorem taxes and sales and use taxes to help pay for these mitigation efforts..

97.    Safer homes reduce the risk of damage, which lowers premiums.

98.    Increased mitigation leads to safer homes and fewer claims.

99.    For example, in 2005, three catastrophic storms hit the United States, generating claims eight times higher than the previous year.

100.    But as discussed above, after substantial mitigation, the flood damage stemming from catastrophic storms was minimal.

101.    Lower premiums and safer homes retain customers in the NFIP system.

102.    RR2.0 devalues mitigation efforts because it does not explain how to calculate the way mitigation will reduce a policyholder's premium.

103.    On March 25, 2021, FEMA revealed that the Army Corps of Engineers issued a draft report about its assumptions regarding the impact of levees, but FEMA ultimately excluded this report from RR2.0. The ALBL reached out to get more information about this report but was told the report never existed and it was a typo.

104.    Although FEMA later revealed the tools it was using to assess risk, those tools failed to account for the number of levees in a district. This shows that, at a minimum, the methodology is flawed.

105.    NLCLDD's undertook expensive and successful mitigation efforts by building a levee. FEMA now has stated that it does not have adequate information to assess the NLCLDD's levees under RR2.0. Instead, FEMA has asked the NLCLDD to turn over additional information that it will input into its secret methodology to determine the changed insurance premiums within the district.

106.    FEMA's lack of transparency devalues and discourages mitigation because there is no clear way to understand its actual value or clearly predict a return on investment.

107.    While RR2.0 considers elevated floors (First Floor Height, "FFH") as a favorable factor used to evaluate "risk," RR2.0 no longer uses the Base Flood Elevation ("BFE") standard. Rather, it only credits elevation above grade. FEMA fails to explain this departure.

108.    The BFE is the elevation of surface water resulting from a flood that has a 1% chance of equaling or exceeding that level in any given year.

109.    RR2.0 does not apply FFH uniformly, discriminating by Flood Zone. This means that an individual could elevate and subsequently lose credit for the FFH because of a map or zone change.

110.    RR2.0 does not accurately reflect the value of property-level and community-level mitigation measures, including the investments in stormwater management and flood protection.

### C. Grandfathering Unavailable

111.    Under the previous rating system, grandfathering was available to policyholders when a map change resulted in either a rating zone or base flood elevation change. It allowed them to keep a reasonable rate and sell the house with the policy to be continued by the new owner under the same rating.

112.    Grandfathering protects policyholders from unexpected rate increases due to risk adjustments reflected in zone changes under new Flood Insurance Rate Maps.

113.    Grandfathering also takes into account a policyholder's compliance with the program and recognizes the reliance interests of policyholders.

114.    Without grandfathering, flood insurance becomes unaffordable, and the value of property drops.

115.    Grandfathering ensures that existing policyholders stay in the program, which increases the available funds and disperses the risk across more policyholders.

116.    Now, all existing policies formerly eligible for grandfathering will transition to their new full risk premium at an escalation of 18% per year.

117.    This means that consumers and businesses who built structures at a certain elevation to comply with the laws in place at the time are no longer in compliance. Overnight, many homes in the area became out of compliance and are now below the current elevation requirements.

118.    The elimination of the grandfathering policy also makes it difficult for individuals to sell their home, and the high costs of insurance deters potential buyers.

**III.    HARM TO THE PLAINTIFFS AND CLASS.**

**A.    CLASS PLAINTIFFS**

119.    Plaintiffs, on behalf of themselves and all others similarly situated, have suffered damages and/or will suffer direct proprietary harm because of Risk Rating 2.0 and Defendants' conduct as alleged in this complaint.

120.    An exhibit and part of this complaint is the May 15, 2023 Declaration of Plaintiff Russell Hebert, Jr., including Exhibits A through F attached thereto.  Plaintiffs hereby adopt and incorporate by reference said May 15, 2023 Declaration of Russell Hebert, Jr. and Exhibits A through F attached thereto ("5/15/2023 Hebert Decl.").

121.    Plaintiffs have never had a lapse of flood insurance coverage relative to Plaintiffs' Property.

122.    Between 1985 and 2008, Plaintiffs' Property flooded multiple times as a result of storm surge flooding that came over the parish levee approximately 1575 feet behind Plaintiffs' Property. It has never flooded from Bayou Terrebonne which is approximately 320 feet in front of Plaintiffs' Property.  *See* 5/15/2023 Hebert Decl. at pp. 1-2.

123.    Since 2008, Plaintiffs' Property has not flooded due to progress on local levee construction and/or the Morganza-to-the-Gulf Hurricane Protection System.  *See* 5/15/2023 Hebert Decl. at p. 2.

124.    As part of the Morganza-to-the-Gulf Hurricane Protection System, several local levees were completed in 2016. This levee system made the parish levee redundant because the storm surge would need to fill a 5000-acre basin before it would even reach the parish levee that previously failed to protect Plaintiffs' Property. It would then need to come over the parish levee before it threatened Plaintiffs' Property.  *See* 5/15/2023 Hebert Decl. at p. 2.

125.    Despite the mitigation efforts put in place relative to Plaintiffs' Property, including but not limited to progress on local levee construction and/or the Morganza-to-the-Gulf Hurricane Protection System, Plaintiffs' flood insurance premiums have greatly and unjustly/illegally increased *since that time*.  *See* 5/15/2023 Hebert Decl. at pp. 2-3.

126.    Moreover, as a result of Risk Rating 2.0, the insurance rates on Plaintiffs' Property have increased significantly and unjustly/illegally from $3,289 in 2021 to $5,611 in 2023.  *See* 5/15/2023 Hebert Decl. at pp. 2-3.

127.    FEMA has not provided Plaintiffs with any information about how it calculated the premium for Plaintiffs' Property, nor has it provided any information about how it will calculate these rates in the future.  *See* 5/15/2023 Hebert Decl. at p. 3.

128.    The mitigation efforts as specified herein have substantially reduced the risk of flooding at Plaintiffs' Property.  Indeed, Plaintiffs' Property has not flooded in fifteen years, and the flood zone for Plaintiffs' Property has remained the same. However, Risk Rating 2.0 increases Plaintiffs' flood insurance rates dramatically, and we don't know whether they will continue to increase.  *See* 5/15/2023 Hebert Decl. at p. 4.

129.    Plaintiffs do not believe they will be able to remain in their home and/or may face bankruptcy as a result of Risk Rating 2.0 and the resulting large increases of flood insurance cost. *See* 5/15/2023 Hebert Decl. at p. 4.

130.    Risk Rating 2.0 has also harmed Plaintiffs because it has imposed an increased cost that Plaintiffs are struggling to pay, and it has injected uncertainty into Plaintiffs' future.  *See* 5/15/2023 Hebert Decl. at p. 4.

131.    Plaintiffs' payments support both mitigation efforts prior to a flooding event and rebuilding efforts after a flooding event.

132.    Plaintiffs have an interest in maintaining high property value and, correspondingly, increasing tax revenue.

133.    Plaintiffs have an interest in continuing to invest in mitigation efforts to minimize property damage and ensure lower premiums for policyholders in the State.

134.    RR2.0 doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the Class's mitigation efforts don't result in lower premiums for policyholders in the State.

135.    RR2.0's high insurance rates will cause Plaintiffs to leave their home and/or the State of Louisiana because they can no longer afford to live in the State.

136.    Even after mitigating to the maximum standards allowed by local building codes, policyholders are still charged an Increased Cost of Compliance premium fee.

137.    Policyholders in X zones are not receiving preferred risk policies, which is resulting in dramatically higher prices. This is causing policyholders to cancel their insurance coverage.

138.    "Equity in Action" will force individuals, such as Plaintiffs, and those similarly situated, to leave their homes because they can no longer afford to live there. For example, Mr. and Mrs. Hebert have lived in their home since 1972, but because of the skyrocketing costs of flood insurance, they are having to decide whether they can even afford to remain in their home.

139.    As individuals like Plaintiffs and putative class members leave their homes, there will be a smaller tax base, causing lower tax revenue and hampering the State's ability to invest in future mitigation projects.

140.    Forced migration, lost revenue, and a smaller tax base cause economic harm that will be felt across the country. More than 50% of GDP is generated near coastal zones of the eastern and western seaboards as well as the Gulf of Mexico, yet these are exactly the areas that "Equity in Action" makes uninhabitable.

141.    Local communities will not be able to recruit or attract workers to fill job openings because housing is not affordable.

142.    In addition, "Equity in Action" eliminated the mitigation discount given for retrofitting at-risk buildings by installing flood protection products, even though millions of at-risk buildings remain. This disincentivizes property owners to retrofit at-risk buildings and try to mitigate potential future damage. Existing property owners in mitigation grant programs are seeing the negative effect of this and, as a result, 20% have already backed out of grant programs in 2023 because of the elimination of mitigation discounts.

143.    Defendants' enactment of Risk Rating 2.0—Equity in Action constitutes a final agency action that is judicially reviewable under the APA. 5 U.S.C. §§704, 706.

144.    It was the culmination of Defendants' decision-making process and it is being used as the basis for new plans and renewals now.

## CLASS ALLEGATIONS

145.    Plaintiffs bring this action on behalf of themselves and others similarly situated under Federal Rules of Civil Procedure 23, as representatives of the Class defined as follows: "*All persons and entities who/which are citizens of the United States who/which are and/or were policyholders of the National Flood Insurance Program ("NFIP") who/which have suffered or will suffer damages as a result of "Risk Rating 2.0—Equity in Action*."

146.    **Exclusions**.  The following persons and entities are excluded from the proposed class: Defendants, their employees, officers, directors, legal representatives; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

147.    **Numerosity**.  Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class but believe that there are at least hundreds of thousands of class members geographically dispersed throughout the State of Louisiana and/or United States.  As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy, more specifically.

148.    **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of defendants as outlined herein.

149.    **Adequacy of Representation**.  Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. Plaintiffs are longtime residents who have seen a dramatic increase in his flood insurance premium as a result of Risk Rating 2.0.  Accordingly, by proving their own claims, Plaintiffs will prove other class members' claims as well.

150.    **Adequacy of Representation**.  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have extensive experience with complex litigation. Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action.

151.    **Commonality**.  There are questions of law and fact common to the Class, which questions relate to the existence of the facts alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

    a.  Defendants' conduct alleged herein;

    b.  Defendants' knowledge alleged herein;

    c.  Whether Defendants' conduct and/or knowledge alleged herein violates the laws as stated in the Causes of Action Section below and/or in any other manner;

    d.  The amount of damages owed the class;

    e.  The appropriate measure of disgorgement;

    f.  The type and format of injunctive relief.

152.    Questions of law and fact common to members of each class will predominate over any questions that may affect only individual class members because Defendants have acted on grounds generally applicable to members of the classes.

153.    Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing damaged persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

154.    Class treatment is also manageable, and Plaintiffs know of no management difficulties that would preclude class certification in this matter.

## CAUSES OF ACTION

### COUNT I
### Risk Rating 2.0—Equity in Action Is Contrary to Law
### (5 U.S.C. §706)

155.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

156.    Courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory ... authority." 5 U.S.C. §706(2)(A), (C).

157.    Equity in Action is a final agency action.

158.    First, FEMA's rates must, "insofar as practicable," be "consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance." 42 U.S.C. §4015(b)(2).

159.    The new policy flouts that objective by making flood insurance functionally unavailable in many communities. *See* Federal Emergency Management Agency, Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0 (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8,

160.    FEMA itself acknowledges that the cost of flood insurance will rise for most policyholders, discouraging existing and prospective policyholders from maintaining coverage.

161.    Defendants have set their rates based on actuarial methods prevailing in the private sector, thereby making the program pointless. While such a rating strategy might be appropriate for the private sector, using such a methodology is inconsistent with the goals of the NFIP and with Congress's statutory command.

162.    In at least one zip code in Louisiana, rates will increase 1098%. *See* Federal Emergency Management Agency, Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0 (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8,

163.    Less than 10 zip codes in Louisiana will see their rates remain the same under "Equity in Action." *See* Federal Emergency Management Agency, Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0 (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8, Every other zip code will see an increase in rates. Not a single zip code will see a decrease. *Id.*

164.    FEMA must "consult with ... State, and local agencies having responsibilities for flood control, flood forecasting, or flood damage prevention" in considering and implementing the program. 42 U.S.C. §4024.

165.    It has failed to do so.

166.    In fact, State officials, parishes, levee board districts, and individuals have tried to get more information, but these efforts have been unsuccessful.

167.     FEMA must "from time to time ... make information and data available to the public, and to any State or local agency or official," regarding the flood insurance program, coverage, and objectives, and flood insurance premium rates, including the basis for and differences between such rates. *Id.* §4020.

168.     It has failed to do so, despite numerous and persistent attempts by affected parties and their representatives.

169.     It has also flipped this burden to injured parties, requiring them to provide information about risk-reducing measures—such as levees—while ignoring anything not reported to them and thereby abdicating their duties.

170.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as outlined herein.

**COUNT II**
**Risk Rating 2.0—Equity in Action Is Arbitrary and Capricious**
**(Failure to Account for Important Aspects of the Problem)**
**(5 U.S.C. §706)**

171.     Plaintiffs repeat and incorporate by reference each of the allegations stated above.

172.     Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. §706(2)(A).

173.     An action is arbitrary and capricious if it fails to take into account important aspects of the problem. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983).

174.     "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (requiring "reasoned decision making"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

175.    Further, agencies must actually analyze the relevant factors. "'Stating that a factor was considered ... is not a substitute for considering it.'" *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021). The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

176.    FEMA failed to take into account seven important aspects of the problem.

177.    First, the agency failed to account for how its inclusion of coastal erosion in its risk assessment would result in a double-counting of risk.

178.    Second, the agency failed to account for the effect on flood risk of levees. Failure to clearly account for levees—which dramatically reduce flood risks—disincentivizes Louisiana and other entities from investing in mitigation projects, like building levees to reduce overall risk.

179.    Third, the agency failed to take into account that the pricing increases would cause mass withdrawals, or the effects of those withdrawals on the financial state of the program and on the program's goal of expanding access to affordable insurance. *Cf. Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1156 (W.D. Wash. 2004) ("The NFIP is not the only source of flood insurance, but flood coverage for residential homeowners in particular is difficult to acquire from the private insurance market.").

180.    FEMA's own 2018 NFIP Affordability Study acknowledged the negative relationship between the cost of a NFIP policy and a consumer's decision to purchase or renew coverage. *FEMA Releases Affordability Framework for the National Flood Insurance Program*, FEMA (Apr. 17, 2018).

181.    Fourth, the agency failed to take into account the extent of the skyrocketing costs generated by its new policy.

182.    In Louisiana, for example, the average full-risk premium for a single-family home will increase 122%, and 90% of ratepayers can expect an annual increase in 18% per year over the next ten years.

183.    Fifth, the agency failed to take into account that the price increases would cause evictions, especially for low-income families.

184.    FEMA's 2018 NFIP Affordability Study concluded that those with the lowest median incomes live in the highest hazard areas—in other words, the areas that are susceptible to the highest premiums under "Equity in Action".

185.    Sixth, the agency failed to take into account the follow-on effects of making flood insurance more costly.

186.    Individuals who cannot afford the increased costs of the insurance will leave the area, lowering the tax base and reducing tax revenue used to invest in flood mitigation.

187.    It will become harder to recruit individuals to the area to enter the workforce because the cost of home insurance is too high.

188.    Fewer workers means lower economic productivity, which will harm the overall GDP across the United States because the most affected regions make up a majority of the nation's GDP.

189.    Seventh, the agency considered inappropriate factors.

190.    It considered the inappropriate factor of climate change. "Equity in Action" uses catastrophe modeling, which takes into account future hypothetical events, including hypothetical events resulting from climate change. The agency does not disclose what these hypothetical events are, nor does the agency explain how the hypothetical events change based on hypothetical future climate activity.

191.    It also considered the inappropriate factor of how its program would advance an unrelated identity-politics agenda. It "integrat[ed]" into its approach to flood insurance factors like race, ethnicity, religion, income, geography, gender identity, sexual orientation, and disability when issuing rules and guidance. FEMA Defines Equity in its Mission of Making Programs More Accessible, FEMA (Sept. 9, 2021); Executive Order 13985 (Jan. 20, 2021).

192.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as outlined herein.

**COUNT III**

**Risk Rating 2.0—Equity in Action Is Arbitrary and Capricious**
**(Reliance Interests)**
**(5 U.S.C. §706)**

193.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

194.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. §706(2)(A).

195.    An action is arbitrary and capricious if it does not consider the reliance interests of those affected by it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

196.    FEMA previously grandfathered certain NFIP policies, which were used to entice people to stay in the communities and pay into the program itself.

197.    FEMA did not consider the reliance interests of homeowners with grandfathered NFIP policies. Instead, it took away their grandfathered rates and subjected them to unexpected higher rates, thereby throwing their life plans into turmoil.

31

198.    FEMA did not consider the reliance interests of homeowners who had already accepted disaster assistance, SBA loans, or other forms of assistance that would require them to maintain qualifying flood insurance for the duration of their agreements. It blind-sided them with unexpected higher and often unaffordable rates, when they had reasonably planned around the rates under the preexisting program.

199.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as outlined herein.

**COUNT IV**
**Risk Rating 2.0—Equity in Action Is Arbitrary and Capricious**
**(Departure from Prior Policy)**
**(5 U.S.C. §706)**

200.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

201.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. §706(2)(A).

202.    An action is arbitrary and capricious if it departs from prior policy without sufficient justification. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016).

203.    FEMA departed from its prior policy and failed to adequately explain doing so.

204.    As an initial matter, FEMA itself acknowledged that "Equity in Action" is "a new pricing methodology." *Risk Rating 2.0: Equity in Action*, FEMA (last accessed March 21, 2023), https://perma.cc/25SC-SM4B. FEMA further describes this methodology as "not just a minor improvement, but a transformational leap forward." *Id.* Yet it refused to explain what the

methodological change was, or what new data the agency relied on, let alone why it undertook those precise changes.

205.    Specifically, "Equity in Action" purports to employ a catastrophic loss model rather than a historical model. FEMA does not provide justification for ignoring historical data related to flooding.

206.    In addition, FEMA eliminated the BFE standard, which it had previously used, and on which people relied. FEMA fails to provide justification for this shift.

207.    Such a "transformational leap" without any explanation violates the APA.

208.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as outlined herein.

**COUNT V**
**Risk Rating 2.0—Equity in Action Is Arbitrary and Capricious**
**(Pretext)**

209.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

210.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. §706(2)(A).

211.    An action is arbitrary and capricious if "it rest[s] on a pretextual basis." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019).

212.    An action rests on pretextual basis whenever there is "a significant mismatch between the decision the [agency] made and the rationale [it] provided." *Id.* at 2575.

213.    FEMA acted pretextually because it claimed to be imposing "Equity in Action" in order to further its statutory obligations but instead imposed it to drive Americans out of homeownership and away from certain areas.

214.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as outlined herein.

**COUNT VI**
**Risk Rating 2.0—Equity in Action Violates the APA's Notice-and-Comment Requirement**
**(5 U.S.C. §706)**

215.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

216.    A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law." 5 U.S.C. §706(2)(D).

217.    Risk Rating 2.0—Equity in Action is a final agency action and legislative rule that requires notice-and-comment rulemaking procedures under the APA.

218.    It was the culmination of Defendants' decision-making process and it is being used as the basis for new plans and renewals now.

219.    But FEMA published it without notice or comment.

220.    Notice-and-comment rulemaking "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments …." 5 U.S.C. §553(c).

221.    The notice-and-comment process also benefits the agency by affording the agency the "chance to avoid errors and make a more informed decision." *Azar v. Alina Health Servs.*, 139 S. Ct. 1804, 1816 (2019).

222.    No exceptions apply.

223.    No good cause exists for failure to undertake notice-and-comment. No emergency situation exists, nor would a delay result in serious harm. *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).

224.    The final rule is not related to internal practice or procedure. *See Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980). Rather, it is a final rule determinative of who can get flood insurance and how much their premiums will cost.

225.    The final rule is not a benefit or contract. 5 U.S.C. §553(a)(2). It is effectively mandatory for policyholders, and the agency's black-box methodology is dispositive of policyholders' obligations to procure the requisite policy. Moreover, only property-owners who live in communities that have enacted FEMA's maps and floodplain management regulations are eligible to purchase an NFIP policy, which is a much more involved program than a mere benefit or contract.

226.    To the extent the agency announced that it sought to update the ratings system broadly, the public did not have fair notice of the specific methodology the agency was considering. *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009).

227.    The final rule was not a logical outgrowth of any proposed rule because "[s]omething is not a logical outgrowth of nothing." And here, the agency provided nothing in advance of its final rulemaking. *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994). This, by definition, fails the logical outgrowth test, which violates the notice-and-comment rulemaking process.

228.    Because the agency failed to issue a notice of proposed rulemaking and undertake the process outlined in the APA, the agency could not consider important aspects of the problem. *See supra* ¶¶ [discussion above about arbitrary and capricious].

229.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as outlined herein.

## COUNT VII
### Risk Rating 2.0—Equity in Action is Contrary to Law
### (5 U.S.C. §706)

230.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

231.    A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law." 5 U.S.C. §706(2)(D).

232.    NEPA requires agencies to consider the environmental effects of major federal actions. When the agency considers taking a major federal action, NEPA asks whether that action is categorically excluded from the NEPA process. If the action is not categorically excluded, then the agency must prepare an Environmental Assessment to determine whether the proposed action has the potential to cause significant environmental effects. If the action will not have an effect, then the agency issues a Finding of No Significant Impact. But if the action will have an effect, then the agency must prepare a draft Environmental Impact Statement. Much like the APA process, this draft is then published for public review and comment. The agency must then issue a final EIS, which provides responses to these comments.

233.    Equity in Action constitutes a major federal action. It has deep economic and political significance for millions of Americans and is having widespread economic and other consequences across the county. In FEMA's own words, "changes to the NFIP are considered to be a major federal action." Letter from the Floodplain Management Division at the Federal Insurance and Mitigation Administration to NFIP Community Officials (Mar. 5, 2019).

234.    To the extent that FEMA has discretion to set the premiums and establish the methodology, *see* 42 U.S.C. § 4015(b), that further shows that it must comply with the NEPA review process. *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion."). The twofold purpose of NEPA is "to inject environmental considerations into the federal agency's decision-making process and to inform the public that the federal agency has considered environmental concerns in its decision-making process." *Macht v. Skinner*, 916 F.2d 13, 18 (D.C. Cir.1990). If the agency "does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable." *Citizens Against Rails-to Trails*, 267 F.3d at 1151. For example, NEPA doesn't apply when the decision is "whether to certify and whether to fund" a project. *Atlanta Coalition on the Transp. Crisis, Inc v. Atlanta Regional Comm'n*, 599 F.2d 1333 (5th Cir. 1979); *see also Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1262 (10th Cir.2001); *Sierra Club v. Babbitt*, 65 F.3d 1502, 1513 (9th Cir.1995).

235.    The NEPA process would have likely affected FEMA's actions because stakeholders could have participated in the review process and pointed out all the flaws in Equity in Action.

236.    Equity in Action is not categorically excluded from the NEPA process because it constitutes an entirely new system for calculating flood insurance rates and does not satisfy any relevant exceptions.

237.    FEMA was therefore required to preliminarily review Equity in Action and issue an Environmental Assessment discussing the effect Equity in Action may have on the environment. It failed to do so and therefore acted without observance of procedure required by law.

238.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages as outlined herein.

## COUNT VIII
## Unjust Enrichment

239.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

240.    Defendants' wrongful conduct, as outlined in this complaint, unfairly and substantially increased the cost of flood insurance premiums incurred by Plaintiffs and class members.

241.    Defendants were unjustly enriched as a result of their wrongful conduct as outlined in this complaint.

242.    Among other things, Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the forms of unfairly and substantially increased payments for flood insurance and/or costs of flood mitigation efforts.

243.    Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs and class members conferred onto Defendants - to the Plaintiffs' and class members' detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the Plaintiffs and class members.

244.    There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

245.    Plaintiffs and class members are entitled to restitution of the benefits Defendants and/or their assigns unjustly retained and/or any amounts necessary to return Plaintiffs and class members to the position they occupied prior to Defendants' wrongful conduct.

246.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, to the extent that without such other claims they would have no adequate legal remedy.

## COUNT IX
## Regulatory Taking and/or Constructive Taking
## (5 U.S.C. §706, U.S. Const., Ams. V, XIV)

247.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

248.    "The Fifth Amendment is violated when land-use … denies an owner economically viable use of his land." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1016 (1992).  Additionally, the Takings Clause of the Fifth Amendment to the United States Constitution provides that no "private property [shall] be taken for public use without just compensation."  U.S. Const. am. V.

249.    Plaintiffs' Property and the properties of class members will become functionally unusable as a result of unfairly and substantially increased flood insurance premiums caused by Defendants' wrongful conduct as outlined in this complaint.

250.    Plaintiffs have incurred such a large increase in the cost of flood insurance premiums that Plaintiffs are facing losing their home, having to move from their home, and/or other financial problems which will result in their home becoming functionally unusable.  *See* 5/15/2023 Hebert Decl. at pp. 1-2.

251.    Defendants' conduct, including implementation of the rules and regulations outlined herein, has interfered with the Plaintiffs' reasonable investment-backed expectations for Plaintiffs' Property and the property of class members.

252.    Defendants' conduct, including implementation of the rules and regulations outlined herein, has had a significant detrimental economic impact on Plaintiffs and class members.

253.    Defendants' conduct, including implementation of the rules and regulations outlined herein, constitutes a taking of Plaintiffs' Property and/or property rights – without just compensation in violation of the Fifth Amendment.

254.    Defendants' conduct, including implementation of the rules and regulations outlined herein, has effected a government-authorized invasion, occupation and/or appropriation of Plaintiffs' Property, for the government.

255.    Alternatively, Defendants' conduct, including implementation of the rules and regulations outlined herein, constitutes an illegal exaction because Defendants have contravened their statutory and regulatory authority, as specified above.

256.    Defendants' conduct has enriched them and/or their assigns at Plaintiffs' expense, directly or in effect, by improperly and/or illegally imposing costs on Plaintiffs in the form of unfairly and substantially increased flood insurance payments.  Plaintiffs should not have to bear these costs, which Defendants should otherwise bear.

257.    The Constitution requires just compensation to Plaintiffs for the taking of Plaintiffs' Property and/or property rights.

258.    Defendants have not provided just compensation to Plaintiffs for the taking of Plaintiffs' Property and/or property rights.


**PRAYER FOR RELIEF**

**NOW, THEREFORE,** Plaintiffs, on behalf of themselves and the proposed Class, request an order and judgment seeking the following relief:

a.   Declaring, under 28 U.S.C. §2201, that Risk Rating 2.0—Equity in Action is arbitrary and capricious and unlawful under the APA;

b.  Declaring, under 28 U.S.C. §2201, that Risk Rating 2.0—Equity in Action is contrary to law and in excess of statutory authority under the APA;

c.  Declaring, under 28 U.S.C. §2201, that Risk Rating 2.0—Equity in Action violates the APA because it was promulgated without notice and comment;

d.  Declaring that Risk Rating 2.0—Equity in Action violates the Constitution;

e.  Holding Risk Rating 2.0—Equity in Action is unlawful and vacating it;

f.  Preliminarily and permanently enjoining, without bond, Defendants from imposing Risk Rating 2.0—Equity in Action;

g.  An order finding that this action may be maintained as a class action, directing that reasonable notice of this action be given to the class, declaring Plaintiffs as named representatives of the class, and declaring that Plaintiffs' counsel be appointed as class counsel;

h.  Entry of judgment against Defendants and in favor of Plaintiffs and the Class;

i.  Awarding damages (including statutory, punitive, and multiple damages as provided by law) and restitution to the class and/or disgorgement from the Defendants in an amount to be determined at trial, plus interest in accordance with law;

j.  Awarding attorney's fees and costs pursuant to any applicable laws, jurisprudence, statutes and/or regulations; and

k.  All other relief this Court deems necessary, just and proper.


Dated:  June 3, 2023                          Respectfully submitted,


                                              */s/ Anthony D. Irpino*
                                              ANTHONY D. IRPINO (La Bar No. 24727)
                                              LOUISE C. HIGGINS (La Bar No. 31780)

PEARL A. ROBERTSON (La Bar No. 34060)
IRPINO, AVIN & HAWKINS LAW FIRM
2216 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 525-1500
Facsimile:  (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com

and

JAMES WILLIAMS (La Bar No. 26141)
MATTHEW A. SHERMAN (La Bar No. 32687)
ANNA M. SINGLETON (La Bar No. 40050)
CHEHARDY SHERMAN WILLIAMS,
RECILE, & HAYES, LLP
1 Galleria Boulevard, Suite 1100
Metairie, Louisiana 70001
Telephone: (504) 833-5600
Facsimile:  (504) 833-8080
james@thetrialteam.com
matthew.sherman@thetrialteam.com
anna@thetrialteam.com