**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| RUSSELL HEBERT, JR., *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>    *Defendants*. | Action No. 2:23-cv-01869-DJP-JVM<br>Section P<br>District Judge Darrel J. Papillion<br>Magistrate Judge Janis van Meerveld |

<u>**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**</u>

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

    A.   Legacy Rating Approach ............................................................................................ 2

    B.   Risk Rating 2.0 ........................................................................................................... 4

STANDARD OF REVIEW ........................................................................................................... 6

ARGUMENT ................................................................................................................................ 7

   I.   Plaintiffs Have Not Established Article III Standing ....................................................... 7

     A.   Plaintiffs Assert No Cognizable Proprietary Harm As Policyholders ............................... 9

       1.   Plaintiffs lack a concrete injury in fact because they benefit financially from Risk Rating 2.0 ............................................................................................. 9

       2.   Any injury in fact is not traceable to Defendants or redressable by this Court .......................................................................................................... 12

     B.   Plaintiffs Assert No Cognizable Harm Based on Premium or Financial Uncertainty .................................................................................................. 14

     C.   Plaintiffs Assert No Cognizable Harm Based on the Other Alleged Interests ................ 15

   II.   Plaintiffs Lack Standing to Assert Their NEPA Claim ................................................. 17

   III.   The Court Lacks Jurisdiction over Plaintiffs' Takings Clause Claim ............................ 20

   IV.   In Any Event, Plaintiffs Fail To State A Takings Clause Claim Upon Which Relief Could Be Granted ........................................................................................................ 22

     A.   Plaintiffs Have Not Alleged a Cognizable Property Interest on Which to Base Their Claim ........................................................................................................ 22

     B.   Plaintiffs Have Not Sufficiently Pleaded Elements of a Regulatory Takings Claim ........ 23

CONCLUSION ............................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Acceptance Ins. Cos. v. United States,*
  583 F.3d 849 (Fed. Cir. 2009).........................................................................................................22

*Adolph v. FEMA,*
  854 F.2d 732 (5th Cir. 1988).....................................................................................................23, 25

*Am. Fed'n of Gov't Emps. Loc. 1 v. Stone,*
  146 F. App'x 704 (5th Cir. 2005).................................................................................................21

*Am. Petroleum Inst. v. U.S. Dep't of Interior,*
  No. 2:21-CV-02506, 2022 WL 16704444 (W.D. La. Oct. 5, 2022)........................................19

*Arizona v. EPA,*
  77 F.4th 1126 (D.C. Cir. 2023)...................................................................................................10

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).......................................................................................................................7

*Ashley Creek Phosphate Co. v. Norton,*
  420 F.3d 934 (9th Cir. 2005).......................................................................................................19

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017).......................................................................................................15

*Bennett v. Spear,*
  520 U.S. 154 (1997).....................................................................................................................18

*Broome v. U.S. Army Corps of Eng'rs,*
  No. 14-2413, 2015 WL 3505149 (E.D. La. June 3, 2015) ........................................................21

*California v. Texas,*
  141 S. Ct. 2104 (2021)............................................................................................................8, 12

*Carney v. Adams,*
  141 S. Ct. 493 (2020)............................................................................................................14, 15

*Chancellor Manor v. United States,*
  331 F.3d 891 (Fed. Cir. 2003).....................................................................................................20

*Chichakli v. Szubin,*
  546 F.3d 315 (5th Cir. 2008).......................................................................................................21

*Choice Inc. of Tex. v. Greenstein,*
   691 F.3d 710 (5th Cir. 2012) ......................................................................................6

*Citizens United v. FEC,*
   558 U.S. 310 (2010) ..................................................................................................13

*City & Cnty. of San Francisco v. Whitaker,*
   357 F. Supp. 3d 931 (N.D. Cal. 2018) .....................................................................14

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ......................................................................................7, 14, 16

*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987) ..................................................................................................18

*Crane v. Johnson,*
   783 F.3d 244 (5th Cir. 2015) ......................................................................................7

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ..................................................................................................15

*Degan v. Bd. of Trs. of Dallas Police & Fire Pension Sys.,*
   956 F.3d 813 (5th Cir. 2020) ........................................................................22, 24, 25

*Denning v. Bond Pharmacy, Inc.,*
   50 F.4th 445 (5th Cir. 2022) .......................................................................................8

*E.T. v. Paxton,*
   41 F.4th 709 (5th Cir. 2022) ...............................................................................12, 13

*Earl v. Boeing Co.,*
   53 F.4th 897 (5th Cir. 2022) .....................................................................................11

*Ecosystem Inv. Partners v. Crosby Dredging, LLC,*
   729 F. App'x 287 (5th Cir. 2018) .............................................................................19

*El Paso Cnty., Texas v. Trump,*
   982 F.3d 332 (5th Cir. 2020) ...............................................................................13, 17

*Enplanar, Inc. v. Marsh,*
   25 F.3d 1043 (5th Cir. 1994) ....................................................................................21

*Fla. Rock Indus., Inc. v. United States,*
   791 F.2d 893 (Fed. Cir. 1986) ..................................................................................21

*Flast v. Cohen,*
   392 U.S. 83 (1968) ....................................................................................................15

*Flecha v. Medicredit, Inc.*,
    946 F.3d 762 (5th Cir. 2020) .................................................................................8

*Franklin v. United States*,
    49 F.4th 429 (5th Cir. 2022) ................................................................................20

*Garrison v. ED*,
    636 F. Supp. 3d 935 (S.D. Ind. 2022) ..................................................................12

*Gerber Prods. Co. v. Perdue*,
    254 F. Supp. 3d 74 (D.D.C. 2017) .......................................................................14

*Groby v. Davis*,
    575 F. Supp. 2d 762 (E.D. La. 2008) ...................................................................15

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023) ............................................................................8, 12, 13

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.*,
    816 F.3d 1241 (9th Cir. 2016) .............................................................................14

*Hearts Bluff Game Ranch, Inc. v. United States*,
    669 F.3d 1326 (Fed. Cir. 2012) ......................................................................22, 23

*Henderson v. Stalder*,
    287 F.3d 374 (5th Cir. 2002) ...............................................................................11

*Highland Vill. Parents Grp. v. U.S. Fed. Highway Admin.*,
    562 F. Supp. 2d 857 (E.D. Tex. 2008) .................................................................18

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) .............................................................................................15

*Home Builders Ass'n of Miss. v. City of Madison*,
    143 F.3d 1006 (5th Cir. 1998) ...............................................................................6

*In re Compl. of RLB Contracting, Inc.*,
    773 F.3d 596 (5th Cir. 2014) .................................................................................7

*In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*,
    570 F. Supp. 2d 851 (E.D. La. 2008) .....................................................................8

*Johnson v. OPM*,
    783 F.3d 655 (7th Cir. 2015) ...............................................................................12

*Keene Corp. v. United States*,
    508 U.S. 200 (1993) .............................................................................................21

*Louisiana by & through La. Dep't of Wildlife & Fisheries v.*
*Nat'l Oceanic & Atmospheric Admin.,*
70 F.4th 872 (5th Cir. 2023)...................................................................................11

*Lance v. Coffman,*
549 U.S. 437 (2007)...................................................................................15

*Lewis v. Casey,*
518 U.S. 343 (1996)...................................................................................8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
572 U.S. 118 (2014)...................................................................................18

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)...........................................................................7, 8, 15

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990)...................................................................................18

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.,*
823 F.3d 184 (3d Cir. 2016)...................................................................................19

*Maritrans Inc. v. United States,*
342 F.3d 1344 (Fed. Cir. 2003)...................................................................................24

*McConnell v. FEC,*
540 U.S. 93 (2003)...................................................................................13

*Members of Peanut Quota Holders Ass'n, Inc. v. United States,*
421 F.3d 1323 (Fed. Cir. 2005)...................................................................................23

*Menchaca v. Chrysler Credit Corp.,*
613 F.2d 507 (5th Cir. 1980)...................................................................................3

*Metro. Edison Co. v. People Against Nuclear Energy,*
460 U.S. 766 (1983)...................................................................................18

*New England Power Generators Ass'n v. FERC,*
707 F.3d 364 (D.C. Cir. 2013)...................................................................................14

*Norsworthy v. Houston Indep. Sch. Dist.,*
70 F.4th 332 (5th Cir. 2023)...................................................................................7

*Penn Central Transportation Co. v. New York City,*
438 U.S. 104 (1978)...................................................................................24

*Phillips v. Wash. Legal Found.*,
   524 U.S. 156 (1998) ................................................................................22

*Pub. Citizen, Inc. v. Bomer*,
   274 F.3d 212 (5th Cir. 2001) ...................................................................15

*Raines v. Byrd*,
   521 U.S. 811 (1997) ..................................................................................8

*Ramming v. United States*,
   281 F.3d 158 (5th Cir. 2001) .....................................................................6

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
   415 F.3d 1078 (9th Cir. 2005) .................................................................19

*Renne v. Geary*,
   501 U.S. 312 (1991) ..................................................................................6

*Rivera v. Wyeth-Ayerst Lab'ys*,
   283 F.3d 315 (5th Cir. 2002) .....................................................................8

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ............................................................................18, 19

*Ruckelshaus v. Monsanto*,
   Corp., 467 U.S. 986 (1984) .....................................................................22

*Ryan v. Nat'l Football League, Inc.*,
   No. 19-cv-1811, 2019 WL 3430259 (E.D. La. July 30, 2019) .................18

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ................................................................................19

*Singh v. RadioShack Corp.*,
   882 F.3d 137 (5th Cir. 2018) .....................................................................8

*Smith v. Orr*,
   855 F.2d 1544 (Fed. Cir. 1988) ..............................................................21

*Solis v. Emery Federal Credit Union*,
   459 F. Supp. 3d 981 (S.D. Ohio 2020) ...................................................10

*Soto v. United States*,
   No. 1:17-CV-51, 2017 WL 11666485 (S.D. Tex. Aug. 31, 2017) ...........21

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .............................................................................7, 8

*Tabb Lakes, Ltd. v. United States,*
  10 F.3d 796 (Fed. Cir. 1993) ................................................................................21

*Taylor v. Denka Performance Elastomer LLC,*
  332 F. Supp. 3d 1039 (E.D. La. 2018) ...................................................................13

*Taylor v. United States,*
  959 F.3d 1081 (Fed. Cir. 2020) ............................................................................24

*Tex. State LULAC v. Elfant,*
  52 F.4th 248 (5th Cir. 2022) ................................................................................13

*Thurman v. Med. Transportation Mgmt., Inc.,*
  982 F.3d 953 (5th Cir. 2020) ..................................................................................7

*Town of Stratford v. FAA,*
  285 F.3d 84 (D.C. Cir. 2002) ................................................................................19

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021) ..........................................................................................10

*United States v. Navajo Nation,*
  556 U.S. 287 (2009) ..............................................................................................20

*United States v. One (1) 1979 Cadillac Coupe De Ville VIN 6D4799266999,*
  833 F.2d 994 (Fed. Cir. 1987) ..............................................................................21

*United States v. Richardson,*
  418 U.S. 166 (1974) ..............................................................................................15

*United States v. Tohono O'Odham Nation,*
  563 U.S. 307 (2011) ..............................................................................................21

*UNR Indus., Inc. v. United States,*
  962 F.2d 1013 (Fed. Cir. 1992) ............................................................................21

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
  435 U.S. 519 (1978) ..............................................................................................18

*Wendt v. 24 Hour Fitness USA, Inc.,*
  821 F.3d 547 (5th Cir. 2016) ................................................................................11

## Constitutional Provisions

U.S. Const. art. III, § 2, cl. 1 ..................................................................................7

**Statutes**

5 U.S.C. § 702 ...............................................................................................................18

28 U.S.C. § 1346 ...........................................................................................................21

28 U.S.C. § 1500 ...........................................................................................................21

42 U.S.C. § 4014 ........................................................................................................ 2, 3

42 U.S.C. § 4015 ...................................................................................................3, 12, 13

42 U.S.C. § 4017a .........................................................................................................10

42 U.S.C. § 4332 ...........................................................................................................18

42 U.S.C. §§ 4321–4370m-12 .......................................................................................18

Biggert–Waters Flood Insurance Reform Act of 2012,
    Pub. L. No. 112-141, 126 Stat. 405 (2012) ...............................................................2

**Other Authorities**

Diane P. Horn, *National Flood Insurance Program: The Current Rating Structure and Risk Rating 2.0*, Cong.
    Research Serv., R45999 (updated Apr. 4, 2022),
    https://perma.cc/2GAT-HN5Z ............................................................................. 3, 4

FEMA, *Program Change–Updated Prior NFIP Claims Rating Factor Guidance*, W-23001 (Mar. 10, 2023),
    https://perma.cc/24CK-V2SH ...................................................................................3

Noreen Clancy et al., *One- to Four-Family Properties with Multiple Losses Insured by the National Flood
    Insurance Program* viii, ix, 27, Homeland Security Operational Analysis Center, Rand Corp. (2023),
    https://www.rand.org/content/dam/rand/pubs/research_reports/RRA2400/RRA2462-
    1/RAND_RRA2462-1.pdf ........................................................................................2

Paul Huang, Assistant Adm'r for Fed. Ins. and Mitigation Admin. to Write Your Own (WYO)
    Principal Coordinators and the NFIP Direct Servicing Agent (Oct. 1, 2020), https://perma.cc/
    3D4W-2HXT ...........................................................................................................3

## INTRODUCTION

As Defendant Federal Emergency Management Agency ("FEMA") has more fully explained in the related *Louisiana v. DHS*, No. 2:23-CV-01839 (E.D. La.) litigation, in 2021 FEMA implemented an actuarial update to the National Flood Insurance Program ("NFIP") called Risk Rating 2.0. In brief, FEMA has updated the NFIP's outdated rate-setting approach with more accepted actuarial principles. Because of these changes, nearly all NFIP premiums have either decreased or slightly increased. And, the actuarial update stops the annual premium increases that were occurring and would continue to occur year after year with the legacy rates.

Despite these improvements, Plaintiffs—two Louisiana NFIP policyholders—filed this putative class action, claiming that they have incurred a financial injury because of Risk Rating 2.0. But Plaintiffs' case does not get off the ground because they have not incurred a financial injury. To the contrary, Plaintiffs actually *save* money under Risk Rating 2.0. Declaring the rating approach unlawful and enjoining it would subject Plaintiffs to premium increases (25% annually) that they faced under the legacy rating approach. And Plaintiffs' allegations of harm based on their financial uncertainty under Risk Rating 2.0 and on any tax-base-related impacts of Risk Rating 2.0 are foreclosed by settled law. Accordingly, the Court should dismiss Plaintiffs' suit for lack of jurisdiction.

Although the entire case should be dismissed for lack of Article III standing, certain claims should be dismissed for additional, independent reasons. Plaintiffs lack statutory standing with respect to their National Environmental Policy Act ("NEPA") claim because Plaintiffs' alleged injuries do not fall within NEPA's zone of interests. In addition, the Court should dismiss Plaintiffs' Takings Clause claim because Plaintiffs have not (1) identified a waiver of sovereign immunity, a jurisdictional requirement, or (2) alleged a cognizable property interest or the elements of a regulatory taking.

## BACKGROUND

On their civil cover sheet (ECF No. 1-2 at 1), Plaintiffs, Mr. and Mrs. Hebert, designated their case as related to *Louisiana*. The two cases involve the same subject matter, defendants, and nearly all the same legal claims. ECF Nos. 5, 6. To avoid needless repetition, Defendants incorporate by reference the background section of their motion to dismiss brief in that case. *See* Mem. in Support of Defs.' Mot. Dismiss 2–18, *Louisiana*, No. 2:23-CV-01839, ECF No. 47-1. Defendants add only a few additional pieces of background—particularly pertinent to the Hebert Plaintiffs' case—on the NFIP premium calculations under the legacy rating approach and under Risk Rating 2.0.

### A.    Legacy Rating Approach

Under the National Flood Insurance Act, a single-family property that "is covered under a contract for flood insurance" through the NFIP and has incurred particular instances of repeated "flood-related damage" is known as a severe-repetitive-loss ("SRL") property. 42 U.S.C. § 4014(h). An SRL property has incurred repeated flood damage giving rise to (1) "4 or more separate claims payments" under the NFIP, "with the amount of each such claim exceeding $5,000" and "the cumulative amount of such claims payments exceeding $20,000"; or (2) "2 separate claims payments … , with the cumulative amount of such claims exceeding the value of the property." *Id.*[1]

SRL properties face higher premiums under the National Flood Insurance Act, as amended by the Biggert–Waters Flood Insurance Reform Act of 2012, Pub. L. No. 112-141, 126 Stat. 405 (2012), which requires SRL properties to have their premiums increased by 25% per year as a class until they reach full risk-based rates. 42 U.S.C. §§ 4014(a)(2)(B) (listing SRL properties as exempt from

---

[1] SRL properties have accounted for an outsized percentage of NFIP claims. Although SRL properties have accounted for about 1% of NFIP-insured properties, they have accounted for over 10% of NFIP claim dollars paid, or $8.4 billion. *See, e.g.*, Noreen Clancy et al., *One- to Four-Family Properties with Multiple Losses Insured by the National Flood Insurance Program* viii, ix, 27, Homeland Security Operational Analysis Center, Rand Corp. (2023), https://www.rand.org/content/dam/rand/pubs/research_reports/RRA2400/RRA2462-1/RAND_RRA2462-1.pdf.

§ 4014(a)'s estimation of rates), 4015(e)(4) (describing how SRL properties' "chargeable risk premium rates … shall be increased by 25 percent each year, until the average risk premium rate for such properties is equal to the average of the risk premium rates described under paragraph (3)," which discusses rate increases for actuarially rated properties); *see also, e.g.*, Ex. A ("Maurstad Decl.") ¶ 15.[2] FEMA complied with this statutory mandate by setting premium rates for all SRLs to increase by 24.9% annually. Mem. from Paul Huang, Assistant Adm'r for Fed. Ins. and Mitigation Admin. to Write Your Own (WYO) Principal Coordinators and the NFIP Direct Servicing Agent at 2 (Oct. 1, 2020), https://perma.cc/3D4W-2HXT. Beginning in 2019, FEMA also began charging a separate surcharge for all SRL-designated properties. *See, e.g.*, FEMA, *Program Change–Updated Prior NFIP Claims Rating Factor Guidance*, W-23001 (Mar. 10, 2023), https://perma.cc/24CK-V2SH; Diane P. Horn, *National Flood Insurance Program: The Current Rating Structure and Risk Rating 2.0*, at 7, Cong. Research Serv., R45999 (updated Apr. 4, 2022), https://perma.cc/2GAT-HN5Z (5% of premium surcharge beginning April 2019, increased to 10% in April 2020 and 15% in April 2021) ("*Cong. Rsch. Serv. Rep.*").

Plaintiffs' NFIP-insured property meets the statutory definition of an SRL. As Mr. Hebert lays out in his declaration, his property has been covered under the NFIP since 1972, Declaration of Russell Hebert, Jr. ("Hebert Decl.") ¶ 6, ECF No. 1-1, the property has "flooded multiple times as a result of storm surge flooding," *id.* ¶ 7, and he has filed five claims between 1985 and 2008, with each claim far exceeding the $5,000 individual-claim threshold for SRL properties and the cumulative claims paid out far exceeding the $20,000 cumulative threshold, *id.* ¶¶ 8–13. To summarize:

- 1985 (Hurricane Juan): Mr. Hebert filed a claim and received $36,780.62 to cover damages.

- 1992 (Hurricane Andrew): Mr. Hebert filed a claim and received $100,491.27 to cover damages.

---

[2] The Court can and should consider the Maurstad Declaration because it contains information relevant to whether Plaintiffs have plausibly asserted a concrete, redressable injury in fact for standing. *See, e.g.*, *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

- 2002 (Hurricane Lilly): Mr. Hebert filed a claim and received $105,256.15 to cover damages.

- 2005 (Hurricane Rita): Mr. Hebert filed a claim and received $94,412.35 to cover damages.

- 2008 (Hurricane Ike): Mr. Hebert filed a claim and received $49,390.62 to cover damages.

*Id.* ¶¶ 8–13; *see* Maurstad Decl. ¶ 38. In total, Plaintiffs have received $386,331.01 in NFIP claims from flood events. Hebert Decl. ¶ 13.

As an SRL, Plaintiffs' property was subject to substantial premium increases—25% annually—prior to Risk Rating 2.0. Plaintiffs' declaration reflects these premium increases. Between 2019 and 2020, Plaintiffs' total payment increased by 23%, from $2,217 to $2,715. *Id.* ¶¶ 17–18.[3] Between 2020 and 2021, Plaintiffs' total payment increased by 24%, to $3,364. *Id.* ¶¶ 18–19. And between 2021 and 2022, Plaintiffs' total payment increased by 24%, to $4,177. *Id.* ¶¶ 19–20. The Maurstad Declaration confirms these figures. It shows that Plaintiffs' premiums—excluding the fees and surcharges in the total payment, which are not subject to the 25% increase, *see, e.g., Cong. Rsch. Serv. Rep.* at 23 & n.84—rose by 25% annually before Risk Rating 2.0. Maurstad Decl. ¶ 40 & n.25.

But even with these rate increases, Plaintiffs' premium rates fell well short of the NFIP claim payouts that they received. Over the life of their policy before Risk Rating 2.0, Plaintiffs paid hundreds of thousands of dollars less than the $386,331.01 they received over their five NFIP claims. Defs.' Mem. in Support of Their Mot. to Dismiss at 33 n.24, *Louisiana*, No. 2:23-CV-01839; Defs.' Mem. in Opp. to Pls.' Mot. for Prelim. Injunction at 12–13, *Louisiana*, No. 2:23-CV-01839, ECF No. 56.

**B.    Risk Rating 2.0**

Risk Rating 2.0 has resulted in 97% of NFIP policyholders seeing, on average, either an immediate decrease in monthly premiums or a $20 or less per month increase in premiums. Maurstad

---

[3] Because the 25% increase is determined for an entire risk class as a whole, and because of the mathematical rounding necessary to translate an entire risk class change into specific rate values, individuals such as the Heberts may not have always had a change exactly equal to 25%. Maurstad Decl. ¶ 40 n. 25.

4

Decl. ¶ 26 (19% of policyholders saw immediate decrease in premiums; 70% of policyholders saw up to a $10 per month increase; and 8% of policyholders saw between a $10-$20 per month increase). Nationwide, policyholders saw annual decreases totaling approximately $577 million ($627 per policy) upon their first renewal under Risk Rating 2.0. *Id.* ¶ 33. In Louisiana, for example, 16% of policyholders saw a decrease in their premiums, and 74% saw an increase of only $10 or less per month. Defs.' Mem. in Support of Their Mot. to Dismiss at 16, *Louisiana*, No. 2:23-CV-01839. And policyholders in several parishes in the state saw more dramatic savings under Risk Rating 2.0: 94% of policies in Tensas Parish saw a decrease, and the same goes for 85% of policies in Bossier Parish and Catahoula Parish. *Id.*

Despite these broad trends, 3% of NFIP policyholders, including Plaintiffs, have seen increases of $20 or more per month in their premiums since Risk Rating 2.0 came into effect. Maurstad Decl. ¶¶ 27, 40. Importantly, Plaintiffs' premiums have initially increased at a similar rate as under the legacy system. Hebert Decl. ¶¶ 20–21. Between 2022 and 2023, the first time Risk Rating 2.0 applied to Plaintiffs' policy, their total payment went up by 25%, from $4,177 to $5,213. *Id.*; *see also* Maurstad Decl. ¶ 40 (detailing similar increase in premium, excluding fees and surcharges).

Risk Rating 2.0 *benefits* Plaintiffs over the life of their policy. For example, Plaintiffs' rate increases will stop entirely in just a few years, in stark contrast to what occurred and would occur under the legacy rating approach. Plaintiffs' policy is expected to reach its full risk rate ($5,611, with a total payment of $6,693, including all statutorily mandated assessments, fees, and surcharges) by 2025. Maurstad Decl. ¶ 40. Assuming no changes in coverage levels or deductibles, Plaintiffs' premium will not increase after this point, as the full risk rate represents the premium cap.[4] *Id.* ¶¶ 40–41. That soon-impending halt in premium increases is consistent with broader Risk Rating 2.0 trends. As of May

---

[4] One exception is that very minor rate increases are possible based on future rate reviews. Maurstad Decl. ¶ 47 n.39, *Louisiana*, No. 2:23-CV-01839.

2023, 36% of NFIP policyholders nationwide were already paying full risk rates, and FEMA expects that 50% of policyholders will be paying full risk rates by 2025–2026. *Id.* ¶ 44.

Under the legacy rating approach, however, many of these policyholders—including SRL homeowners like Plaintiffs—would continue to face premium increases of 25% per year for an indefinite (i.e., unknown or unspecified) period of time. *Id.* ¶ 32. Under that approach, FEMA could not make individualized assessments of an SRL property's (or any property's) true flood risk based on its geographic and structural characteristics. *Id.* As a result, FEMA could not (1) identify a property's true flood risk and (2) limit rate increases to that amount. Instead, FEMA had to broadly raise rates across a rate class—increases that were necessary given FEMA's premium shortfalls for more than a decade—with no limit on how high premiums could ultimately reach. *Id.* ¶ 36. Under the legacy approach, annual premium rates for single-family homes could escalate as high as $87,534 plus applicable fees, surcharges and assessments in extreme cases. But under Risk Rating 2.0, premiums are capped at $12,125 annually for single-family homes. *Id.* ¶ 35.

## STANDARD OF REVIEW

Defendants move to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Under that rule, a court must dismiss a case if it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). As a result, a court should "consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The burden of proof rests with the party asserting jurisdiction. "[Courts] presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotation marks omitted). To survive a Rule 12(b)(1) motion to dismiss, a plaintiff must allege sufficient facts in its complaint that, when accepted as true, plausibly establish jurisdiction. *See, e.g.*, *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012). A court resolving

a Rule 12(b)(1) motion is not limited to the face of the complaint; to determine whether subject-matter jurisdiction exists, the court may view whatever evidence has been submitted on the issue and decide factual questions. *See, e.g.*, *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015); *In re Compl. of RLB Contracting, Inc.*, 773 F.3d 596, 601 (5th Cir. 2014).

Defendants also move to dismiss Plaintiffs' Takings Clause claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Under that rule, a court must dismiss if the well-pleaded facts, accepted as true and construed in the light most favorable to the plaintiff, do not plausibly state a basis for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Norsworthy v. Houston Indep. Sch. Dist.*, 70 F.4th 332, 336 (5th Cir. 2023). If a claim "clearly lacks merit—for example, where there is an 'absence of law to support a claim of the sort made'"—it must be dismissed. *Thurman v. Med. Transportation Mgmt., Inc.*, 982 F.3d 953, 956 (5th Cir. 2020). A court "do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Norsworthy*, 70 F.4th at 336.

## ARGUMENT

### I.    Plaintiffs Have Not Established Article III Standing

Article III of the Constitution limits the judicial power of federal courts to deciding "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1, and standing is "an essential and unchanging part of" this requirement, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As the parties "invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing" standing. *Id.* at 561. They must demonstrate "an injury in fact" that is "fairly traceable to the challenged conduct" and "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The injury in fact must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Defs. of Wildlife*, 504 U.S. at 560 (quotation marks omitted). An "imminent" threatened injury "must be *certainly impending* to constitute injury in fact"; "[a]llegations of *possible* future injury" and "mere[] speculat[ion] and … assumptions" "are not sufficient." *Clapper v.*

7

*Amnesty Int'l USA*, 568 U.S. 398, 409, 411 (2013) (quotation marks omitted). An injury in fact is fairly traceable if there is a "causal connection between the injury and the conduct complained of," *Defs. of Wildlife*, 504 U.S. at 560, and it is redressable if the court has the power to afford the relief requested and that relief will remedy the specific harm alleged, *see, e.g.*, *Haaland v. Brackeen*, 143 S. Ct. 1609, 1639 (2023); *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). Because Plaintiffs assert that an executive agency acted unconstitutionally, Compl. ¶¶ 247–58, ECF No. 1, the Court's inquiry on these standing questions must be "especially rigorous." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

"These standing requirements are equally applicable in class actions." *Singh v. RadioShack Corp.*, 882 F.3d 137, 151 (5th Cir. 2018). "That a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show" "at the pleading stage" "that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo*, 578 U.S. at 338 & n.6 (alteration and quotation marks omitted); *see, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 357 (1996). If the named plaintiffs in a putative class action lack standing, "there is no Article III suit to begin with." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020). In that circumstance, "[s]tanding is an inherent prerequisite to the class certification inquiry," *Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 319 (5th Cir. 2002) (quotation marks omitted), and a court must dismiss the suit for lack of jurisdiction, *see e.g.*, *Singh*, 882 F.3d at 151; *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 570 F. Supp. 2d 851, 854–55 (E.D. La. 2008). This jurisdictional "defect" cannot be "cured by allowing [a plaintiff] to certify a class or add additional plaintiffs to her suit." *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 453 n.8 (5th Cir. 2022).

Plaintiffs assert three types of harms allegedly caused by Risk Rating 2.0: (1) "damages" and "direct proprietary harm" because of "significant[]," "unjust[]," and "illegal[]," increases to their flood insurance premiums, Compl. ¶¶ 119, 126; (2) uncertainty as to their upcoming rates and financial future, *id.* ¶¶ 127–30; and (3) injury to their "interest" in "maintaining high property value[s] and …

8

tax revenue" and in future "mitigation efforts" due to rising premiums and rating methodology changes, *id.* ¶¶ 132–33; *see id.* ¶¶ 134, 138–39, 141–42. But none of these alleged harms is cognizable under Article III.

### A. Plaintiffs Assert No Cognizable Proprietary Harm As Policyholders

Plaintiffs' alleged proprietary harm is not cognizable because (1) Plaintiffs fail to allege a concrete financial injury in fact, and (2) any such injury is neither traceable to Risk Rating 2.0 nor redressable by declaring Risk Rating 2.0 unlawful and enjoining the rating approach. Either defect suffices to dismiss their Complaint.

#### 1. *Plaintiffs lack a concrete injury in fact because they benefit financially from Risk Rating 2.0*

Plaintiffs fail to allege a concrete financial injury because they benefit economically under Risk Rating 2.0. Plaintiffs do not face "dramatic[]" Risk Rating 2.0 rate increases, Compl. ¶¶ 7, 128; rather, they save money under Risk Rating 2.0.

Plaintiffs ignore these savings. Plaintiffs' incorrect assertion that they face dramatic rate increases relies on several mistaken assumptions. First, although Plaintiffs allege that FEMA has significantly increased their rates from $3,289 in 2021 to $5,611 in 2023, Compl. ¶¶ 91, 126,[5] Plaintiffs ignore that they faced identical rate increases before Risk Rating 2.0 because of their home's designation as an SRL property, subject to 25% annual premium increases, Maurstad Decl. ¶ 40. Second, Plaintiffs ignore that they would be subject to such premium increases indefinitely absent Risk Rating 2.0, with no certain end date. Third, Plaintiffs ignore that Risk Rating 2.0 saves them from experiencing such indefinite increases by placing them on the glide path to reach their full risk rate by

---

[5] Risk Rating 2.0 began applying to Plaintiffs' policy only in 2023, since FEMA applied the rating approach to existing policies upon their renewal after April 2022. In other words, only the rate increase from $4,177 to $5,611 is attributable to Risk Rating 2.0; all prior increases are attributable to the legacy rates. Moreover, Plaintiffs did not pay $5,611 in 2023. They paid $5,213. Hebert Decl. ¶ 21.

2025. In other words, Risk Rating 2.0 has not harmed Plaintiffs in the short term because they have not had to pay any more money than they would have paid as SRL policyholders under the legacy approach. In fact, Plaintiffs will reach their full risk rate in 2025 after just a 3% increase in their building and content premium (i.e., the actuarial calculation dictated by Risk Rating 2.0) and Reserve Fund assessment (i.e., 18% of the premium, as mandated by 42 U.S.C. § 4017a, independent of Risk Rating 2.0). Maurstad Decl. ¶ 40 & n. 25. That small annual increase is far less than the 25% annual increases that Plaintiffs were subject to and would have been subject to under the legacy rating approach. And Risk Rating 2.0 clearly benefits Plaintiffs in the long term because it caps their rates at the full risk premium and thus saves them from "significant" annual increases, totaling many thousands of dollars, over the remainder of their policy. Put slightly differently, Plaintiffs come out well ahead under Risk Rating 2.0 as compared to under the legacy rating approach. As a result, "[n]o concrete harm, no standing." *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2200 (2021).

Courts have held in a variety of contexts that there is no Article III injury when defendants' challenged conduct actually benefits plaintiffs. In *Arizona v. EPA*, for example, the D.C. Circuit held that states lacked standing to challenge the EPA's deadline extension for compliance with a revised national drinking water regulation, since the extension "imposes no further" economic or regulatory "burden on the states" and in fact "gives the states more options" as to when to take necessary regulatory actions. 77 F.4th 1126, 1130–31 (D.C. Cir. 2023). Likewise in *Solis v. Emery Federal Credit Union*, the district court held that a residential mortgage borrower lacked standing to sue a lender over price fixing for title and settlement services at above market rates "[b]ecause [the borrower] *saved money* on the title-related services (rather than over-paying, which is the alleged sources of the harm here)." 459 F. Supp. 3d 981, 988 (S.D. Ohio 2020) (emphasis added). The corollary is also equally true. Courts routinely hold that there is no Article III injury when plaintiffs claiming economic injury fail to plausibly show a monetary loss due to defendants' challenged conduct. In *Earl v. Boeing Co.*, for

10

example, the Fifth Circuit held that airline ticket purchasers lacked an Article III economic injury to challenge airlines' allegedly fraudulent concealment of an aircraft safety defect because the purchasers failed to show they were financially worse off due to the defendants' conduct. Specifically, the purchasers failed to identify "lost money that wouldn't have been lost in a counterfactual world without the fraudulent scheme." 53 F.4th 897, 903 (5th Cir. 2022) (observing that plaintiffs actually may have been "better off financially," further undercutting their standing, because the earlier exposure of the fraudulent scheme likely would have resulted in plaintiffs having to take "different, more expensive … flights" than they otherwise took); *see also, e,g.*, *Henderson v. Stalder*, 287 F.3d 374, 379 (5th Cir. 2002) (plaintiffs lacked taxpayer standing to challenge a state law authorizing license plates bearing a pro-life message, because the extra fees that drivers paid for these plates "offset the administrative costs associated with the issuance of the . . . plates" and plaintiffs identified no way in which the manufacture or distribution of the plates would require them to pay any more in income taxes); *Louisiana by & through La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 884 (5th Cir. 2023) (similar); *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 n.10 (5th Cir. 2016) (similar).

In light of these cases, Plaintiffs' lack of concrete harm is clear. Plaintiffs *come out ahead* financially under Risk Rating 2.0. Plaintiffs indisputably will save many thousands of dollars in future premiums each year because Plaintiffs will soon reach full risk rates and avoid any further rate increases (i.e., the 25% annual premium rate increases that Plaintiffs faced under the legacy rating approach). At a minimum, Plaintiffs cannot show any monetary loss under Risk Rating 2.0. Though Plaintiffs complain of dramatic and unjust Risk Rating 2.0 rate increases, they have not had to pay and will not have to pay any more money under the new rating approach than they would have paid in legacy rates as SRL policyholders. In fact, they will soon have to pay much less money under Risk Rating 2.0 than

under the legacy approach. Without plausibly alleging a clear financial harm, Plaintiffs have not established an injury in fact.

      2.    *Any injury in fact is not traceable to Defendants or redressable by this Court*

Even if the Court determines that Plaintiffs have suffered a financial injury, Plaintiffs still lack standing, because any financial injury is neither fairly traceable to Risk Rating 2.0 nor redressable by granting their requested relief.

Plaintiffs' "significant[]" premium increases over the past two years are not fairly traceable to Risk Rating 2.0, Compl. ¶ 126, because Plaintiffs were subject to the same "significant" increases "'independent[]' of" Risk Rating 2.0, in the years prior to FEMA implementing the new rating approach. *Brackeen*, 143 S. Ct. at 1640 (claims of "direct pocketbook injury associated with the costs of keeping records, providing notice in involuntary proceedings, and producing expert testimony before moving a child to foster care or terminating parental rights" were not "fairly traceable" to statutory placement preferences for custody determinations of Indian children, since "these alleged costs … operate independently of" the placement provisions (quotation marks omitted)); *California*, 141 S. Ct. at 2119–20 (similar). By the independent operation of 42 U.S.C. § 4015(e)(4), and not Risk Rating 2.0, Plaintiffs were subject to premium increases of 25% annually prior to their policy renewal in 2022 under Risk Rating 2.0. *See, e.g.*, *E.T. v. Paxton*, 41 F.4th 709, 720 (5th Cir. 2022) (no traceability for state's prohibition of mask mandates where plaintiffs did not control for "variables" regarding COVID-19 transmission, their alleged harm, "that have nothing to do with mask mandates"); *Johnson v. OPM*, 783 F.3d 655, 662 (7th Cir. 2015) (no traceability where "plaintiffs' administrative injury would continue to exist even if the Rule were cured of all of its alleged infirmities"); *Garrison v. ED*, 636 F. Supp. 3d 935, 941 (S.D. Ind. 2022) (no traceability for federal student relief program because "program only provides a benefit by eliminating part of [p]laintiffs' debt load," and their claimed injury, which

was that the benefit would be treated as taxable income under Indiana state law, was "solely cause[d]" by that state law).

Relatedly, Plaintiffs' alleged premium increases will not be redressed if the Court sets aside or enjoins Risk Rating 2.0. Plaintiffs will continue to face annual increases of 25% even without Risk Rating 2.0 because FEMA is required by statute to increase premiums on these policies at a rate of 25% annually. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 229 (2003) (no redressability as a result of invalidation of federal law where unchallenged, separate law meant that "alleged injury … would remain unchanged"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010); *Tex. State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022) ("Redressability is … a problem when declaring one law unenforceable may not provide relief because a different law independently causes the same injury." (quotation marks omitted)), *cert. denied*, No. 22-809, 2023 WL 6377790 (S. Ct. Oct. 2, 2023); *E.T.*, 41 F.4th at 721 (no redressability where, regardless of injunction against state Attorney General, plaintiffs still faced "the exact same risks" of contracting COVID-19). Given the operation of § 4015(e)(4), and the significant premium increases that Plaintiffs experienced before Risk Rating 2.0, neither of which they seek to invalidate, Compl. at pp. 40–41 (Prayer for Relief), the injunctive or declaratory relief they seek "would not give [Plaintiffs] legally enforceable protection from the allegedly imminent harm." *Brackeen*, 143 S. Ct. at 1639; *see also, e.g.*, *El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 341–42 (5th Cir. 2020); *Taylor v. Denka Performance Elastomer LLC*, 332 F. Supp. 3d 1039, 1050 (E.D. La. 2018). Plaintiffs would instead face indefinite increases, with no cap. *See* Maurstad Decl. ¶¶ 32, 35–36 (pointing out how, under the legacy rating approach, premium rates were not capped and could rise as high as $87,534 annually for a single-family home, in contrast to the $12,125 cap under Risk Rating 2.0 for single-family homes and the fact that an individual property's rate increases stop when the full risk rate is reached).

Plaintiffs' allegations underscore these traceability and redressability deficiencies. Plaintiffs

themselves assert that their "flood insurance premiums have greatly and unjustly/illegally increased since [2016]"—*before* Risk Rating 2.0. Compl. ¶ 125 (emphasis omitted) (discussing rising NFIP premiums even after completion of levee construction in 2016). In other words, Plaintiffs recognize that, independent of Risk Rating 2.0, they previously faced the premium increases on which they now base their suit. And they tacitly admit that setting aside or enjoining Risk Rating 2.0 will do nothing to address the allegedly illegal increases.

### B. Plaintiffs Assert No Cognizable Harm Based on Premium or Financial Uncertainty

Perhaps because of the tacit admission that they would face premium increases regardless of Risk Rating 2.0, Plaintiffs attempt to manufacture standing based on alleged uncertainty that Risk Rating 2.0 creates for their upcoming rates and financial future. Compl. ¶¶ 127–30. But bare uncertainty is not a "concrete" injury that is "certainly impending." *Amnesty Int'l USA*, 568 U.S. at 409 (quotation marks and emphasis omitted); *see, e.g.*, *Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.*, 816 F.3d 1241, 1250 (9th Cir. 2016) ("[B]are uncertainty … absent any concrete application that threatens imminent harm to [their] interests, cannot support standing." (quotation marks omitted)); *New England Power Generators Ass'n v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013) ("It would be a strange thing indeed if uncertainty were a sufficiently certain harm to constitute an injury in fact."); *City & Cnty. of San Francisco v. Whitaker*, 357 F. Supp. 3d 931, 944 (N.D. Cal. 2018) (similar); *Gerber Prods. Co. v. Perdue*, 254 F. Supp. 3d 74, 81 (D.D.C. 2017) (similar). Were the law otherwise, all plaintiffs could establish standing: any "abstract and generalized" confusion about the impact of statutes and federal programs could give rise to suit in federal court. *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).

At any rate, Plaintiffs' claims of uncertainty are directly undercut by the pleadings. Plaintiffs' most recent declaration page shows that their full risk rate—what Risk Rating 2.0 informs—is $5,611. Hebert Decl. at p. 11.

14

### C.     Plaintiffs Assert No Cognizable Harm Based on the Other Alleged Interests

Having failed to establish standing based on financial harm or financial uncertainty, Plaintiffs finally attempt to base standing on an alleged injury to their "interest[s]" in high property values, increased tax revenues, or future mitigation efforts, Compl. ¶¶ 132–33; *see id.* ¶¶ 134, 138–39, 141–42. These are "nothing more than … abstract and generalized harm[s]" applicable to *all* taxpayers and property owners in Louisiana and across the country. *Adams*, 141 S. Ct. at 498. They are not concrete and particularized harms, as Article III requires. *See, e.g.*, *id.* at 498–99. The Supreme Court has a "lengthy pedigree" of refusing to allow federal courts to serve as a forum for generalized grievances. *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam); *see, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 348 (2006). The Supreme Court has consistently warned that a plaintiff cannot establish standing by, as Plaintiffs attempt to do here, asserting an abstract "general interest common to all members of the public," *Lance*, 549 U.S. at 440, "no matter how sincere" or "deeply committed" a plaintiff is to vindicating that general interest on behalf of the public, *Hollingsworth v. Perry*, 570 U.S. 693, 706–07 (2013); *see also, e.g.*, *Defs. of Wildlife*, 504 U.S. at 573–75; *United States v. Richardson*, 418 U.S. 166, 176–77 (1974); *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 219 (5th Cir. 2001); *Groby v. Davis*, 575 F. Supp. 2d 762, 766 (E.D. La. 2008). The Complaint identifies no basis to circumvent this longstanding bar. It does not identify anything beyond Plaintiffs' status as a taxpayer and corresponding interest in a larger tax base to benefit the economy and fund mitigation—an interest all taxpayers share. *See, e.g.*, *Barber v. Bryant*, 860 F.3d 345, 355–56 (5th Cir. 2017) (discussing how *Flast v. Cohen*, 392 U.S. 83 (1968), provides only a "narrow exception to the general rule against taxpayer standing" for suits challenging a federal "program[] enacted under the Taxing and Spending Clause that involve[s] more than an incidental expenditure of tax funds in the administration of an essentially regulatory statute" (quotation marks omitted)).

Abstractions and generalizations aside, the alleged injuries to Plaintiffs' tax base, property value, and mitigation interests are only tenuously connected to Risk Rating 2.0. To accept that Risk Rating 2.0 will harm these interests, the Court would have to accept that a lengthy daisy chain of events will occur: *First*, that Risk Rating 2.0 will devalue mitigation efforts and relatedly result in higher premiums for Louisiana residents; *second*, that these changes will be so severe that they will cause Louisiana residents to stop undertaking mitigation efforts and also to leave the NFIP, increasing the risk of damage for properties in the event of flooding and further raising premiums; *third*, that the increased premiums will be so high that current Louisiana residents won't be able to afford to live in their communities and will be forced to leave the State, and local communities won't be able to attract workers to move there and fill job openings; *fourth*, that this population loss will depress property values and do so to the extent that local and state tax base and tax revenues will be significantly lowered; and *fifth* that, as a result, Louisiana will lack the resources necessary to sufficiently invest in future mitigation, exposing residents such as the Heberts to greater flood damage. *See, e.g.*, Compl. ¶¶ 74–91 (allegations about premium increases), 92–104 (allegations about mitigation), 132–42 (allegations about the broad impacts of Risk Rating 2.0).

For the same reasons that this attenuated theory does not support the state and local governments' standing in *Louisiana*, No. 2:23-CV-01839, ECF No. 47-1, at 26–28, it does not support Plaintiffs' standing. Plaintiffs' theory relies on a "highly attenuated chain of possibilities." *Amnesty Int'l USA*, 568 U.S. at 410 (similarly involving a five-step chain of injury). It requires the Court to accept not just that some premiums will rise under Risk Rating 2.0, but that *many* will rise *substantially*, for a *significant* number of Louisiana residents; and to accept not just that some individuals may leave Louisiana, but that the apparently substantial and significant premium changes will cause a *major* exodus of tax-paying property owners from the state and deprive the state and communities of mitigation funds to protect against flood damage. Moreover, Plaintiffs' theory runs headlong into the

established rule that the "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact." *El Paso*, 982 F.3d at 339; *see Louisiana*, No. 2:23-CV-01839, ECF No. 47-1, at 34–36.

In fact, the tenuousness of Plaintiffs' standing is even more pronounced in this case. Plaintiffs ask the Court to assume each successive link from increased premiums to decreased tax revenues and greater flood damage based on a *single* declaration describing their premiums increases under Risk Rating 2.0 and on a handful of statistics on premium increases, including statistics on increases for "some communities" in some parishes. Compl. ¶ 78; *see, e.g., id.* ¶¶ 77, 83. Plaintiffs fail to connect these examples of premium increases—which would occur over the life of a policy and be capped annually at 18%—to unaffordable housing for many or even a sizeable segment of Louisiana residents, let alone to any resulting community-wide tax-base impacts. Nor could they, since 16% of Louisiana policyholders saw a decrease in their premiums under Risk Rating 2.0 and 74% saw an increase of only $10 or less per month. *Supra* p. 5. And the logic of *El Paso* applies even more strongly to individual taxpayers than it does to the *El Paso* plaintiff, a local government. *El Paso* explains that local and state governments cannot base standing simply on the "loss of general tax revenues as an indirect result of federal policy," because "virtually all federal policies" "inevitably" have incidental economic repercussions on them, and allowing these repercussions to confer standing could "spark a waive [sic] of unwarranted litigation against the federal government." 982 F.3d at 339–40 (quotation marks omitted). The Court would invite an even greater wave of unwarranted litigation if it were to confer standing to individual taxpayers like Plaintiffs based on the trickle-down effect on them of incidental state/local government tax revenue losses.

## II.    Plaintiffs Lack Standing to Assert Their NEPA Claim

In addition to lacking Article III standing, Plaintiffs lack statutory standing with respect to their NEPA claim.

Congress enacted NEPA, 42 U.S.C. §§ 4321–4370m-12, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978); *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983); 42 U.S.C. § 4332(2)(C). "NEPA does not provide a private right of action. Instead, challenges to NEPA-mandated decisionmaking are pursued through the APA." *Highland Vill. Parents Grp. v. U.S. Fed. Highway Admin.*, 562 F. Supp. 2d 857, 860 (E.D. Tex. 2008). Under the APA, a plaintiff must establish that an "agency action" caused an adverse effect "within the meaning of a relevant statute" before a court can reach the merits of a claim. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (quoting 5 U.S.C. § 702). The alleged adverse effect must fall within the "zone of interests" protected by the statutory provision invoked in the suit. *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

The "zone of interests" test prevents claimants from using NEPA's requirements to vindicate grievances unrelated to the statute's purpose. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987) ("The 'zone of interest' test is a guide for deciding whether . . . a particular plaintiff should be heard to complain of a particular agency decision."). Referring to this test as "statutory standing," courts in this district have recognized that the "zone of interests" test eliminates "generalized grievances," and "the assertion of the right of a third party." *Ryan v. Nat'l Football League, Inc.*, No. 19-cv-1811, 2019 WL 3430259, at *2 (E.D. La. July 30, 2019) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)).

The purpose of NEPA is to promote environmental quality through its procedural mandates. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989). NEPA's zone of interests encompasses only environmental concerns, like air and water quality, aesthetic enjoyment, and recreational use of land. *See Nat'l Wildlife Fed'n*, 497 U.S. at 886 (deciding that "recreational use and aesthetic enjoyment" are among the sorts of interests that NEPA was "specifically designed to

protect"); *Robertson*, 490 U.S. at 339–43, 352, 357–58 (considering impacts to air quality, water quality, and wildlife); *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (examining damage to scenery and historical objects that would impair enjoyment). Because NEPA's zone of interests relates only to environmental concerns, plaintiffs must establish an environmental interest to obtain relief. "Mere interest in a problem" is insufficient, *Sierra Club*, 405 U.S. at 739 (quotation marks omitted), and a party "cannot simply rely on its or the public's free-floating interest in environmental stewardship" to bring a NEPA claim, *Ecosystem Inv. Partners v. Crosby Dredging, LLC*, 729 F. App'x 287, 299 (5th Cir. 2018) (per curiam). Rather, a concrete and specific environmental interest is necessary. *Id.*; *accord Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005); *Town of Stratford v. FAA*, 285 F.3d 84, 88 (D.C. Cir. 2002).

Economic effects fall outside NEPA's zone of interests. *Ecosystem*, 729 F. App'x at 296 (affirming dismissal of NEPA claim because plaintiff's claim "relates to its pocketbook not the environment"); *Am. Petroleum Inst. v. U.S. Dep't of Interior*, No. 2:21-CV-02506, 2022 WL 16704444, at *9 (W.D. La. Oct. 5, 2022) ("The majority of NEPA authority nationwide makes clear that economic injury alone does not satisfy the statute's zone of interest test."); *see also Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 194 (3d Cir. 2016) ("To be among those that Congress intended to bring suit under NEPA, a plaintiff's actual interests must substantially align with the protection of our physical environment."); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 945 (9th Cir. 2005) (holding that "a purely economic injury that is not intertwined with an environmental interest" is not contemplated by NEPA's zone of interests).

The Complaint focuses on premium rates under Risk Rating 2.0. *See e.g.*, Compl. ¶¶ 7, 58–59, 62, 72–91, 102, 116, 125–30, 135–37. Missing, however, is any connection to the environment. Indeed, Mr. Hebert claims that Risk Rating 2.0 has personally affected him only because of "an increased cost" and "uncertainty" about his family's financial future. Hebert Decl. ¶ 36. Plaintiffs' interests are clearly

financial, not environmental. *See* Compl. ¶ 132 ("Plaintiffs have an interest in maintaining high property value and, correspondingly, increasing tax revenue."); *id.* ¶ 133 ("Plaintiffs have an interest in continuing to invest in mitigation efforts to minimize property damage and ensure lower premiums for policyholders in the State."). At bottom, Plaintiffs challenge a new pricing approach that has no impact on the environment. *Id.* ¶ 50. By claiming financial harm without specifying any environmental impact, Plaintiffs fail to establish a cognizable interest protected by NEPA. They consequently lack statutory standing.

## III.   The Court Lacks Jurisdiction over Plaintiffs' Takings Clause Claim

There is no waiver of sovereign immunity that would grant the Court jurisdiction over Plaintiffs' Takings Clause claim. Compl. ¶¶ 254, 258. For a court to have jurisdiction over a case against the United States, waiver of sovereign immunity must be unequivocal, and the plaintiff bears the burden of identifying such a waiver. *See Franklin v. United States*, 49 F.4th 429 (5th Cir. 2022). Plaintiffs have not done so here. Congress has waived sovereign immunity for such claims only in limited circumstances and venues, which are not present here. *United States v. Navajo Nation*, 556 U.S. 287, 289 (2009). And the Fifth Amendment itself does not waive sovereign immunity. *Chancellor Manor v. United States*, 331 F.3d 891, 898 (Fed. Cir. 2003) (to succeed under a Fifth Amendment takings theory, plaintiff must prove the United States waived its sovereign immunity in some way, such as through the Tucker Act). This Court, therefore, lacks jurisdiction to adjudicate Plaintiffs' takings claim and it should be dismissed.

Some plaintiffs point to the Little Tucker Act as a basis for the district court's jurisdiction. The limited waiver provided by that statute, however, applies only to claims for money damages not

in excess of $10,000.[6] 28 U.S.C. § 1346(a)(2). Plaintiffs allege that "the amount in controversy exceeds $5 million, exclusive of interest and costs." Compl. ¶ 25. Therefore, Plaintiffs' Takings Clause claim exceeds the strict limits of Little Tucker Act jurisdiction. Although a plaintiff can avail itself of the Little Tucker Act by waiving recovery in excess of $10,000, Plaintiffs have not expressed any intent to limit their recovery to $10,000.[7] *Broome v. U.S. Army Corps of Eng'rs*, No. 14-2413, 2015 WL 3505149, at *3 (E.D. La. June 3, 2015) ("For the Court to sustain jurisdiction over this claim under the Little Tucker Act, Plaintiff[s] must expressly limit the amount of damages to $10,000."); *see also Chichakli v. Szubin*, 546 F.3d 315, 317 (5th Cir. 2008); *Enplanar, Inc. v. Marsh*, 25 F.3d 1043, at *2 (5th Cir. 1994) (per curiam); *Smith*, 855 F.2d at 1553.

Moreover, to bring suit under the Tucker Act, Plaintiffs "must concede the validity of the government action which is the basis of the taking claim . . . ." *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993); *Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 899 (Fed. Cir. 1986) (takings claim under the Tucker Act must concede agency's authority to act). Yet, Plaintiffs' Complaint alleges the opposite—that Risk Rating 2.0 itself is unlawful.

---

[6] The Federal Circuit has exclusive appellate jurisdiction over the merits of decisions regarding the Little Tucker Act, and district courts apply Federal Circuit case law to the merits of Little Tucker Act claims. *Smith v. Orr*, 855 F.2d 1544, 1547 (Fed. Cir. 1988); *United States v. One (1) 1979 Cadillac Coupe De Ville VIN 6D4799266999*, 833 F.2d 994, 998 (Fed. Cir. 1987); *Soto v. United States*, No. 1:17-CV-51, 2017 WL 11666485, at *2 (S.D. Tex. Aug. 31, 2017); *see also Am. Fed'n of Gov't Emps. Loc. 1 v. Stone*, 146 F. App'x 704, 705 (5th Cir. 2005) (per curiam).

[7] The Court of Federal Claims also lacks jurisdiction to hear Plaintiffs' takings claims at this time. Section 1500 divests the Court of Federal Claims of jurisdiction over a claim if there is another related claim pending in another court. 28 U.S.C. § 1500; *Keene Corp. v. United States*, 508 U.S. 200, 207-08 (1993). The purpose of the statute is to "save the Government from burdens of redundant litigation," *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 315 (2011), and it does so by "forc[ing] plaintiffs to choose between pursuing their claims in the [Court of Federal Claims] or in another court." *UNR Indus., Inc. v. United States*, 962 F.2d 1013, 1018, 1021 (Fed. Cir. 1992), *aff'd sub nom. Keene Corp. v. United States*, 508 U.S. 200 (1993).

Plaintiffs have not met their burden to establish that this Court has jurisdiction to hear their takings claim, and the Court should dismiss the claim for lack for jurisdiction.

## IV.   In Any Event, Plaintiffs Fail To State A Takings Clause Claim Upon Which Relief Could Be Granted

Even if Plaintiffs could surmount these threshold jurisdictional deficiencies, Plaintiffs' Complaint fails to state a takings claim upon which relief could be granted. Courts apply a two-part for analyzing takings claims. The first, threshold step is to determine "whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2012). Only if the first step is met do courts then determine whether the property interest was "taken." *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 855–56 (Fed. Cir. 2009).

### A.   Plaintiffs Have Not Alleged a Cognizable Property Interest on Which to Base Their Claim

Plaintiffs fail to identify a valid property interest that has been taken, a prerequisite to maintaining their claim. *See Ruckelshaus v. Monsanto Corp.*, 467 U.S. 986, 1000 (1984); *Degan v. Bd. of Trs. of Dallas Police & Fire Pension Sys.*, 956 F.3d 813, 815 (5th Cir. 2020) (citing *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 163–64 (1998)).

Plaintiffs claim that future increases in flood insurance policy premiums from Risk Rating 2.0 are the relevant government action because, Plaintiffs fear, they will no longer be able to afford their NFIP flood insurance policy in January 2024. Compl. ¶¶ 135, 138, 249–50. They claim the effect of price increases from Risk Rating 2.0, and the purported inability to afford an NFIP flood insurance policy in the future, means they will "fac[e] losing their home, hav[e] to move from their home, and/or other financial problems will result in their home becoming functionally unusable," Compl. ¶ 250. None of these allegations identify a cognizable property interest taken by government action that supports a takings claim. Plaintiffs do not hold a property right in the availability of federally-

subsidized flood insurance, much less a right to purchase such flood insurance at a price that Plaintiffs deem affordable.

Although Plaintiffs have in the past had access to federally subsidized flood insurance backed by the NFIP, that does not vest in them a property interest in the future availability of a federally subsidized flood insurance. Voluntary participation in a government benefit program does not confer a property interest to Plaintiffs for future participation—the government can adjust or eliminate its programs at will without effecting a taking. *Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1334-35 (Fed. Cir. 2005); *see Adolph v. FEMA*, 854 F.2d 732, 735 (5th Cir. 1988) ("[T]he NFIP represents a voluntary federal program"). Additionally, unilateral expectations about a government program do not create a property interest. *See Hearts Bluff*, 669 F.3d at 1332.

Defendants acknowledge that real property constitutes a cognizable property interest. However, Plaintiffs do not allege that the government has taken their real property for a public purpose by modifying its flood insurance rates. Nor do Plaintiffs allege that ownership of their house includes a legal right to buy a federal insurance policy at all, much less at a particular price. Critically, the entity that Plaintiffs suggest will repossess their home if they do not purchase a new flood insurance policy in January 2024 is not the federal government, but a third-party mortgage broker with whom they voluntarily contracted.

Because Plaintiffs have not identified a cognizable property interest on which to base their takings claim, the claim must be dismissed.

### B.      Plaintiffs Have Not Sufficiently Pleaded Elements of a Regulatory Takings Claim

Plaintiffs fail to allege facts sufficient to support a claim that Defendants have deprived them of all economically beneficial uses of their property. Plaintiffs' allegations concern only a future price

increase in an NFIP flood insurance policy they wish to renew to satisfy the terms of their mortgage but which they claim they will not be able to afford. Compl. ¶¶ 249–50.

Plaintiffs also fail to allege facts sufficient to support a partial regulatory taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). "*Penn Central* provided three factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Degan*, 956 F.3d at 815 (quotation marks omitted). To survive a motion to dismiss, a complaint must allege facts sufficient to satisfy each of those factors. *See Taylor v. United States*, 959 F.3d 1081, 1090 (Fed. Cir. 2020) (finding that where, "on the allegations of [the] complaint," "each of the *Penn Central* factors weighs strongly against finding a regulatory taking," the claim "cannot succeed as a matter of law"); *see also Degan*, 956 F.3d at 815 (affirming trial court's dismissal for failure to state a claim because allegations did not support *Penn Central* factors).

Plaintiffs do not plead specific facts in support of each element of the *Penn Central* test, instead choosing to either recite the legal elements of a *Penn Central* inquiry (*e.g.*, Compl. ¶¶ 251–52) or make conclusory allegations that are insufficient as a matter of law. Plaintiffs do not allege facts addressing the character of the governmental action. This factor "requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition." *Maritrans Inc. v. United States*, 342 F.3d 1344, 1356 (Fed. Cir. 2003). "[I]nterference [that] arises from some public program adjusting the benefits and burdens of economic life to promote the common good" is less likely to be a taking than conduct characterized as a physical invasion. *Id.* (quotation marks omitted).

Even apart from Plaintiffs' insufficient allegations, the character of Risk Rating 2.0 is not that of a taking. The purpose of Risk Rating 2.0 is to modernize and improve the NFIP's flood insurance rate structure. Defs.' Mem. in Support of Their Mot. to Dismiss at 5–17, *Louisiana*, No. 2:23-CV-01839. And Plaintiffs come out ahead financially under the program. *Supra* pp. 5, 9–12. Adjustments

to flood insurance policy pricing do not regulate the use of Plaintiffs' property or effect a physical occupation of the property by the government, and Plaintiffs do not allege otherwise. *Degan*, 956 F.3d at 815–16 (allegations about "modifying [the] mechanics" of a state pension fund did not sufficiently plead facts to support the "character of governmental action" factor of *Penn Central*). Further, the Fifth Circuit previously upheld dismissal of a takings challenge to NFIP program requirements, finding the "NFIP is not a taking as a matter of law." *Adolph,* 854 F.2d at 736.

For these reasons, Plaintiffs have not sufficiently pled a takings claim.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated:  November 6, 2023

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

LESLEY FARBY
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Yoseph T. Desta*
YOSEPH T. DESTA
(CA Bar # 332179)
BENJAMIN TAKEMOTO
(DC Bar # 1045253)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-3080
Email: yoseph.t.desta@usdoj.gov

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources
Division

KRYSTAL-ROSE PEREZ
(TX Bar # 24105931)
LAURA DUNCAN
(Tx Bar # 24092366)
Trial Attorneys
United States Department of Justice
Environmental & Natural Resources
Division
P.O. Box 7611, Ben Franklin Station,
Washington, D.C. 20044
Tel: (202) 305-0486
Email: krystal-rose.perez@usdoj.gov

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2023, the foregoing was filed electronically through ECF/CM.  On this same date, electronic service will be made to all counsel of record through the Court's ECF/CM system.

/s/ Yoseph T. Desta
YOSEPH T. DESTA
Trial Attorney, U.S. Department of Justice