**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| RUSSELL HEBERT, JR., *et al.*,<br><br>                    *Plaintiffs*,<br><br>     v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY, *et al.*,<br><br>                 *Defendants*. | Action No. 2:23-CV-01869-DJP-JVM<br>Section P<br>District Judge Darrel J. Papillion<br>Magistrate Judge Janis van Meerveld |

**DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................1

I.    Defendants Challenge Plaintiffs' Article III Standing and Appropriately Rely on the Maurstad Declaration for this Jurisdictional Purpose ........................................1

II.   Plaintiffs Have Not Established Article III Standing ...............................................4

    A.   Plaintiffs Assert No Cognizable Harm as Policyholders ............................4

        1.   Plaintiffs rely on bare assertions of financial injury and ignore specific evidence that they benefit financially from Risk Rating 2.0 ............4

        2.   Any financial injury in fact is not traceable to Defendants or redressable by this Court ...............................................................7

    B.   Plaintiffs Assert No Cognizable Harm Based on Other Alleged Interests ........8

III.  Plaintiffs Lack Statutory Standing to Assert Their NEPA Claim ...........................10

IV.  The Court Lacks Jurisdiction Over Plaintiffs' Takings Clause Claim ......................11

V.   In the Alternative, Plaintiffs Fail to State a Takings Clause Claim ..........................12

CONCLUSION.....................................................................................................................12

# TABLE OF AUTHORITIES

**CASES**

*Bauer v. Marmara,*
    774 F.3d 1026 (D.C. Cir. 2014) ....................................................................................3

*Brown v. Div. of Water Rights of Dep't of Nat. Res.,*
    228 P.3d 747 (Utah 2010) ............................................................................................9

*Clapper v. Amnesty International USA,*
    568 U.S. 398 (2013) ....................................................................................................8

*Davis v. Wells Fargo,*
    824 F.3d 333 (3d Cir. 2016) .......................................................................................2

*Ecosystems Inv. Partners v. Crosby Dredging, LLC,*
    729 F. App'x 287 (5th Cir. 2018) .............................................................................11

*El Paso County, Texas v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ................................................................................ 8, 10

*Ex parte McCardle,*
    U.S. 506 (1868) ........................................................................................................... 2

*First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,*
    482 U.S. 304 (1987) ..................................................................................................11

*Fla. Key Deer v. Paulison,*
    522 F.3d 1133 (11th Cir. 2008) ...............................................................................11

*Fla. Key Deer v. Stickney,*
    864 F. Supp. 1222 (S.D. Fla. 1994) .........................................................................11

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ....................................................................................................7

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ....................................................................................................8

*Knick v. Twp. of Scott, Pennsylvania,*
    139 S. Ct. 2162 (2019) .............................................................................................11

*Loughlin v. United States,*
    230 F. Supp. 2d 26 (D.D.C. 2002) .............................................................................2

*Lucas v. S.C. Coastal Council,*
    505 U.S. 1003 (1992) ...............................................................................................12

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................................. 2

*Menchaca v. Chrysler Credit Corp.*,
   613 F.2d 507 (5th Cir. 1980) ............................................................................................... 3

*Metro. Edison Co. v. People Against Nuclear Energy*,
   460 U.S. 766 (1983) ........................................................................................................... 10

*Montez v. Dep't of Navy*,
   392 F.3d 147 (5th Cir. 2004) ........................................................................................... 2, 3

*N.Y. State Club Ass'n, Inc. v. City of New York*,
   487 U.S. 1 (1988) ................................................................................................................. 8

*Paterson v. Weinberger*,
   644 F.2d 521 (5th Cir. 1981) ........................................................................................... 3, 5

*Ruckelshaus v. Monsanto Corp*,
   467 U.S. 986 (1984) ........................................................................................................... 12

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................................................. 3

*Steel Co. v. Citizens for a Better Envt.*,
   523 U.S. 83 (1998) ............................................................................................................... 2

*Stueve Bros. Farms, LLC v. United States*,
   737 F.3d 750 (Fed. Cir. 2013) .......................................................................................... 12

*Tex. Democratic Party v. Benkiser*,
   459 F.3d 582 (5th Cir. 2006) ............................................................................................... 4

*Utah Chapter of Sierra Club v. Utah Air Quality*,
   148 P.3d 975 (Utah 2006) ................................................................................................ 8, 9

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) ............................................................................................... 3

*Young Conservatives of Texas Foundation v. Smatresk*,
   73 F.4th 304 (5th Cir. 2023) ............................................................................................... 7

**STATUTES**

42 U.S.C. § 4002(a)(2) ............................................................................................................. 10

42 U.S.C. § 4022(b) ................................................................................................................. 10

42 U.S.C. § 4015(e) ............................................................................................................... 5, 7

42 U.S.C. § 4321 ................................................................................................................................10

**OTHER AUTHORITIES**

FEMA, *NFIP Community Rating System Coordinator's Manual* (2017),
   https://perma.cc/879C-23Y2. ..............................................................................................10

**INTRODUCTION**

One of the many benefits of Risk Rating 2.0, FEMA's actuarial update to the National Flood Insurance Program, is the financial savings for many policyholders. One such policyholder is Plaintiff Russell Hebert, whose premium will reach its full risk rate in 2025, in contrast to the indefinite 25% annual increases that he would have faced under the legacy rating approach. Because Plaintiffs have not plausibly alleged a financial injury, the jurisdictional basis of their Complaint, Defendants have moved to dismiss for lack of jurisdiction. Rather than seriously contend with Defendants' arguments, however, Plaintiffs either argue against straw men (i.e., that Defendants are improperly raising merits arguments) or ignore Defendants' arguments altogether (i.e., that Plaintiffs have not plausibly alleged causation or redressability), falling far short of their burden to plausibly allege jurisdiction. Although the entire Complaint should be dismissed because of Plaintiffs' failure to plausibly allege a financial injury, the Court lacks jurisdiction over two claims for additional, independent reasons: Plaintiffs' National Environmental Policy Act ("NEPA") claim does not fall within the statute's zone of interests, and Plaintiffs do not identify a waiver of sovereign immunity or allege a cognizable property interest or regulatory taking in support of their Takings Clause claim. Accordingly, the Court should dismiss this case for lack of jurisdiction, in some respects for multiple reasons.

**ARGUMENT**

**I.      Defendants Challenge Plaintiffs' Article III Standing and Appropriately Rely on the Maurstad Declaration for this Jurisdictional Purpose**

Plaintiffs begin their Opposition by incorrectly asserting that Defendants "offer no argument whatsoever regarding this Court's jurisdiction" under Rule 12(b)(1) and instead: (1) raise merits challenges that must be considered (and rejected) under Rule 12(b)(6); and (2) introduce improper merits evidence through the declaration of Assistant Administrator David Maurstad. *See* Pls.' Opp'n

to Defs.' Mot. to Dismiss 3–5, ECF No. 23 [hereinafter Pls.' Opp'n]. Plaintiffs are wrong on both counts.

First, far from "ignor[ing] the jurisdictional issues" in this case, Pls.' Opp'n 4, Defendants spent the bulk of their opening brief discussing in detail why Plaintiffs fail to plausibly allege Article III standing. *See* Defs.' Mem. in Supp. of Their Mot. to Dismiss 7–17, ECF No. 18-1 [hereinafter Defs.' Mem.]. Standing is "an essential and unchanging part of" a court's subject-matter jurisdiction, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); a plaintiff must establish standing "first," at the outset of a case, because without it no justiciable case or controversy exists under the Constitution and "the only function remaining to the court is that of announcing the fact and dismissing the cause," *Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 U.S. 506, 514 (1868)); *see also, e.g.*, Defs.' Mem. 6–7. Plaintiffs cannot sidestep this fundamental constitutional principle by mischaracterizing Defendants' Article III standing challenge as merits arguments. *See* Pls.' Opp'n 4–5 (also asserting that Defendants' jurisdictional arguments are "intertwined" with the merits). Nor can they do so by relying on a few inapt cases rejecting Rule 12(b)(1) arguments because those arguments actually turned on merits issues appropriately resolved under Rule 12(b)(6). *See* Pls.' Opp'n 3 (citing *Montez v. Dep't of Navy*, 392 F.3d 147, 150–51 (5th Cir. 2004) (argument that government employee was not acting in scope of employment for purposes of liability under Federal Torts Claim Act (FTCA) was merits argument inappropriate for Rule 12(b)(1)); *Davis v. Wells Fargo*, 824 F.3d 333, 350 (3d Cir. 2016) (similar, regarding merits defense that plaintiff should have sued defendant's subsidiary because subsidiary, not defendant, was the only responsible party); *Loughlin v. United States*, 230 F. Supp. 2d 26, 36 (D.D.C. 2002) (similar, regarding statute of limitations defense under FTCA)). Plaintiffs never explain how Defendants' standing arguments intersect with the merits of Plaintiffs' various Administrative Procedure Act ("APA") claims challenging, among other things, the methodology underlying Risk Rating 2.0 and the notice FEMA provided. In fact, Defendants' standing

arguments turn not on the merits of Plaintiffs' claims but instead on fundamental standing inquiries: whether Plaintiffs have plausibly alleged any economic or other harms due to Risk Rating 2.0 (regardless of its legal validity) that are concrete, traceable to Defendants, and redressable by the Court if Risk Rating 2.0 is declared unlawful and enjoined. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

It is of no moment that Plaintiffs claim to have a federal statutory basis to have their case heard and obtain relief. *See* Pls.' Opp'n 4. "[S]tanding and … stat[ing] a cause of action are not the same." *Bauer v. Marmara*, 774 F.3d 1026, 1029 (D.C. Cir. 2014). The former is always jurisdictional and is thus a threshold question to be resolved under Rule 12(b)(1). Although the latter can sometimes be "intertwined" with jurisdictional questions, and although courts adjudicating such "intertwined" cases typically do not dismiss them under Rule 12(b)(1) unless they are frivolous and instead proceed under Rule 12(b)(6), Pls.' Opp'n 3, this circumstance is present only when a defendant's jurisdictional challenge also effectively "challenge[s]… the existence of a federal cause of action" on the merits, *Montez*, 392 F.3d at 150. Yet here, Defendants' standing challenge is a quintessential jurisdictional standing challenge, and Plaintiffs identify zero reason why—like the FTCA scope of employment and statute of limitations questions in *Montez* and *Loughlin* or the lack-of-responsibility defense in *Davis*— it is actually a (merits) wolf in (jurisdictional) sheep's clothing.

Because Defendants raise an appropriate Article III standing challenge under Rule 12(b)(1), they appropriately rely on the Maurstad Declaration, and the Court should not "ignore[]" it. Pls.' Opp'n 5. A court may make whatever legal and factual determinations are necessary to assure itself of its subject-matter jurisdiction or dismiss a case when it cannot. *See, e.g.*, *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). This includes considering matters outside the pleadings, such as declarations, to evaluate Article III standing at the Rule 12 stage. *See, e.g.*, *id.*; *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980); *see also Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (noting

that when a defendant submits an affidavit, the plaintiff must marshal facts "through some evidentiary method" to demonstrate the court's subject-matter jurisdiction). The Maurstad Declaration addresses how Plaintiffs financially benefit under Risk Rating 2.0, which undercuts Plaintiffs' ability to plausibly show an economic injury in fact for standing. Defendants rely on the declaration in their legal argument for this purpose alone; neither Defendants nor Administrator Maurstad make any merits arguments regarding Plaintiffs' "arbitrary and capricious" APA claim or other APA claims. As discussed below, it is instead Plaintiffs who—having failed to marshal any evidence to plausibly show a concrete, traceable, and redressable injury in fact—inappropriately invoke the merits.

## II.     Plaintiffs Have Not Established Article III Standing

Plaintiffs fail to allege cognizable harms based either on their status as policyholders under Risk Rating 2.0, *see* Pls.' Opp'n 8–11, or on other alleged interests, *see id.* at 11–13.

### A.     Plaintiffs Assert No Cognizable Harm as Policyholders

#### 1.     *Plaintiffs rely on bare assertions of financial injury and ignore specific evidence that they benefit financially from Risk Rating 2.0*

Plaintiffs identify three reasons why "Risk Rating 2.0 premium calculations" subject them to a "concrete" economic injury in fact, *id.* at 8, but none withstands scrutiny.

**a.** Plaintiffs repeatedly contend in conclusory fashion that their premiums under Risk Rating 2.0 have "increased dramatically" and thus have financially injured them. *Id.* at 8; *see id.* at 1, 9–10. Their spare assertions of significant premium increases are insufficient to plausibly allege an injury. Just because economic harm is a "quintessential" Article III injury in fact as a general matter does not mean that Plaintiffs in particular have incurred such a harm. Because Plaintiffs have cited no explanation or proof for their alleged economic harm, which is their burden, Plaintiffs' own cited authority makes clear that they lack standing. *See id.* at 8 (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (holding injury in fact existed because plaintiff political party identified

specific additional funds and resources it would have to expend to find candidate to replace one struck from ballot)).

In fact, Defendants have made a detailed showing directly refuting any claimed injury from premium increases, which Plaintiffs disregard. Backed up by the data in the Maurstad Declaration, Defendants have shown that (a) in the short term, Plaintiffs have not been made any worse off financially under Risk Rating 2.0 because, under 42 U.S.C. § 4015(e), their severe-repetitive-loss ("SRL") property has been subject to the exact same 25% premium increase as under the legacy rating approach; and (b) from 2025 onward, Plaintiffs actually come out ahead financially under Risk Rating 2.0, which caps their rates at the full risk rate and thus saves them from indefinite annual premium increases, totaling many thousands of dollars, over the remainder of their policy. *See* Defs.' Mem. 9–10 (relying on Declaration of David Maurstad ¶ 40 & n. 25, ECF No. 18-2). Defendants also cite several cases holding that no Article III injury exists when, as here, a defendant's conduct actually benefits plaintiffs economically or leaves them no worse off. *See id.* at 10–11. Plaintiffs engage with none of this. They marshal no contrary evidence, even though they must do so to establish standing. *See Paterson*, 644 F.2d at 523. They completely ignore the on-point cases that Defendants discuss. And Plaintiffs do not even acknowledge that their property is an SRL property or cite to § 4015 even once.

Plaintiffs instead speciously claim that Defendants' argument is "speculative" and supported by "vague and scarce evidence," Pls.' Opp'n 10, without acknowledging at all the definitive data and detailed and robust explanations in the Maurstad Declaration and Defendants' brief. And they mischaracterize Defendants' footnote observation that annual rate reviews may result in very minor rate increases for some policies—miscasting this innocuous point as a concession that Plaintiffs will continue to face premium increases beyond their full risk rates. Annual rate reviews are standard practice across insurance industries to ensure that rates adequately reflect factors, such as inflation, that will affect insurance costs during the coverage period and thus must be taken into account.

Consistent with this standard practice, FEMA employed rate reviews under the legacy rating approach and continues to employ them under Risk Rating 2.0 to ensure that premiums are technically accurate. Nothing in the Maurstad Declaration, the pleadings, or Plaintiffs' arguments indicates that Plaintiffs will, because of a rate review, experience a minor rate increase that exceeds one that they previously faced under the legacy rating approach, let alone that any increase will even occur. And even accepting Plaintiffs' mischaracterization, it is still indisputable that Plaintiffs come out ahead financially under Risk Rating 2.0; the rating approach halts the indefinite 25% premium increases that Plaintiffs could have faced as SRL policyholders under the legacy rating approach.

**b.** Rather than substantiate any concrete injury based on premium increases, Plaintiffs attempt to manufacture standing based on alleged "financial uncertainty" that Risk Rating 2.0 creates for their upcoming rates and financial future. *See* Pls.' Opp'n 7, 9, 11. They briefly contend that Risk Rating 2.0's "unexplained" calculations and erroneous methodological changes, which they assert have led to significant premium increases already and potential but uncertain further increases going forward, threaten their financial ability to remain in their home or find a potential homebuyer. *See id.* at 7, 9, 11. But the Complaint is devoid of allegations that Plaintiffs intend to sell their home, let alone that Risk Rating 2.0 would negatively affect that sale. And as Defendants have already explained, these bare assertions of financial uncertainty are foreclosed both by case law and by the pleadings. *See* Defs.' Mem. 14.

**c.** Finally, Plaintiffs claim that Risk Rating 2.0 harms them as policyholders because the rating approach "discard[s] relevant factors like community mitigation and policy duration"; wrongly "decreased" or "eliminated" subsidies and discounts that they and others relied on "without explanation" and eliminated their right to transfer their policy at a grandfathered rate; and made all these "sweeping," unlawful regulatory changes without the required notice and comment. Pls.' Opp'n 1–2, 7–11. Not only are these assertions wrong, *see e.g.*, Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim.

Inj. at 10–33, *Louisiana v. DHS*, No. 2:23-CV-01839, ECF No. 56; they are also all *merits* arguments regarding the legality of Risk Rating 2.0—arguments that Plaintiffs ironically assert have no relevance in the Rule 12(b)(1) analysis.

> ### 2. *Any financial injury in fact is not traceable to Defendants or redressable by this Court*

Plaintiffs barely address traceability or redressability, and they do not engage at all with Defendants' arguments on these issues. Defendants have argued that Plaintiffs fail to plausibly allege traceability because the Maurstad Declaration and Plaintiffs' own allegations show that the legacy rating approach subjected Plaintiffs to the same "significant" premiums they now complain of under Risk Rating 2.0. *See* Defs.' Mem. 12 (explaining that, by the independent operation of 42 U.S.C. § 4015(e)(4), and not Risk Rating 2.0, Plaintiffs were subject to premium increases of 25% annually prior to Risk Rating 2.0); *id.* at 14 (identifying Plaintiffs' own allegations regarding pre-Risk Rating 2.0 premium increases). And Defendants have argued that Plaintiffs fail to plausibly allege redressability because declaring Risk Rating 2.0 unlawful and enjoining it does nothing to stop those legacy rate premium increases, mandated by statute for SRL policyholders, from going back into effect. *See id.* at 13. Plaintiffs respond to neither of these dispositive arguments nor the cases that Defendants rely on. Plaintiffs instead simply assert that their injuries as policyholders are "directly traceable to FEMA's implementation of Risk Rating 2.0, which will continue to cause harm as more premium payments are due and owing." Pls.' Opp'n 11. They claim that this assertion is "enough to establish traceability" and redressability under *Young Conservatives of Texas Foundation v. Smatresk*, 73 F.4th 304, 311 (5th Cir. 2023). But neither their argument nor their single case law citation addresses the key fact foreclosing traceability and redressability here: Plaintiffs' premium and other alleged injuries as policyholders would continue to exist "*independently of*" Risk Rating 2.0 and regardless of any declaratory or injunctive relief against the rating approach. *Haaland v. Brackeen*, 599 U.S. 255, 293, 296 (2023) (emphasis added); *cf. Young Conservatives*, 73 F.4th at 310–11 (addressing scenario where students' alleged pocketbook

injury from higher tuition did not have independent cause and instead was directly and solely caused by university officials' enforcement of statute and redressable by preventing application of statute).

### B.     Plaintiffs Assert No Cognizable Harm Based on Other Alleged Interests

Having failed to plausibly establish any concrete, traceable, and redressable injury as policyholders, Plaintiffs double down on allegations asserting harms to their interests "in property values, increased tax revenues, and future mitigation efforts" in their community and other similarly situated Louisiana "coastal communities." Pls.' Opp'n 11–12. As Defendants have already explained, (1) a wealth of Supreme Court and other precedent plainly holds that such asserted injuries are too generalized and abstract for Article III standing, Defs.' Mem. 15; and (2) cases such as *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013), and *El Paso County, Texas v. Trump*, 982, F.3d 332, 339–40 (5th Cir. 2020), separately bar these types of injuries because they depend on a highly attenuated chain of causation, Defs.' Mem. 16–17. Plaintiffs fail to overcome either independent bar.

Plaintiffs rely on a Utah Supreme Court decision, *Utah Chapter of Sierra Club v. Utah Air Quality*, 148 P.3d 975 (Utah 2006), to show that their alleged property value and other interests are sufficiently particularized and concrete for Article III of the U.S. Constitution. Plaintiffs conflate federal and state law. The Utah Supreme Court did not interpret its jurisdiction under the *U.S.* Constitution; rather, the Utah Supreme Court held that plaintiffs who alleged "health, recreation, and property" injuries also shared by many others in their community had stated a legally cognizable injury under the "traditional" state law test for standing established by Utah state courts. *Id.* at 979–80. State courts are not bound by the "special limitations" that "Article III of the Constitution imposes on the jurisdiction of the federal courts," such as the bar on generalized tax base grievances that forecloses Plaintiffs' claims. *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 8 n.2 (1988); *see also, e.g., Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013) ("[S]tanding in federal court is a question of federal law, not state law. And no matter its reasons, the fact that a State thinks a private party should have standing to seek relief for

a generalized grievance cannot override our settled law to the contrary."). In fact, the Utah Constitution does not limit state courts' jurisdiction to cases or controversies, *see Brown v. Div. of Water Rights of Dep't of Nat. Res.*, 228 P.3d 747, 750–51 (Utah 2010) (observing instead that the Utah Constitution "mandates certain standing requirements"), so *Sierra Club* is especially irrelevant to Plaintiffs' standing under the U.S. Constitution.[1]

Plaintiffs' attempt to show a direct, rather than highly attenuated, causal link between Risk Rating 2.0 and their alleged tax base and other interests fares no better. Plaintiffs do not dispute that their alleged theory of harm depends on a five-part chain of possibilities from rising premiums to diminished tax resources for mitigation, Defs.' Mem. 16, instead arguing that "many of these events have already occurred," Pls.' Opp'n 12. Their allegations do not bear this out. Plaintiffs focus entirely on how they have sufficiently alleged that Risk Rating 2.0 will devalue mitigation and result in higher premiums for Louisiana residents—the very first step in their causal chain. They assert that (1) a reduction in their Community Rating discount under Risk Rating 2.0, (2) FEMA's failure to give them any mitigation discount for levee improvements in their community, (3) FEMA data showing that 70% of NFIP policyholders saw up to a $10 per month increase in rates under Risk Rating 2.0, and (4) Risk Rating 2.0's elimination of grandfathering all show that Risk Rating 2.0 has and will unjustifiably raise their premiums and others' premiums. *See* Pls.' Opp'n 12–13. Even if these

---

[1] *Sierra Club* also does not present a "parallel" that aids Plaintiffs' standing argument. The case specifically grounded its standing analysis in plaintiffs' allegation of a specific and direct *personal* injury from the approval of a power plant expansion: decreased property values for *their* properties as a direct consequence of the approval of a power plant expansion. *Sierra Club*, 148 P.3d at 980. Here, the Heberts do not make any allegation in their Complaint or declaration that Risk Rating 2.0 has or will specifically devalue their property, nor do they plausibly allege that FEMA's development of the premium rating approach itself directly impacts property values in their community. The highly speculative causal chain they rely on to claim any sort of downstream tax base or property damage, *see* Defs.' Mem. 16, hardly seems "parallel" to the direct property impact at issue in *Sierra Club*.

assertions were true,[2] they do not plausibly show any of the four other causal events necessary for there to be measurable impact on Louisiana communities' tax bases and ability to invest in flood mitigation. For example, that 70% of NFIP policyholders experienced up to a $10 increase in monthly premiums does *nothing* to show that NFIP premiums will rise so high in Louisiana that Louisiana communities will experience serious population loss and downstream tax-base impacts. Plaintiffs do not attempt to make any such argument connecting and substantiating the several links between this modest rise in premiums and taxes. And even if Plaintiffs did try to make such a showing, it would be squarely foreclosed by *El Paso*, 982, F.3d 332, a case that Plaintiffs once again ignore.

## III.   Plaintiffs Lack Statutory Standing to Assert Their NEPA Claim

Plaintiffs' alleged economic injury is untethered from NEPA's purpose to "promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. Therefore, the Court should dismiss Plaintiffs' NEPA claim for the additional, independent reason that Plaintiffs lack statutory standing. *See Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 778 (1983) ("If a harm does not have a sufficiently close connection to the physical environment, NEPA does not apply.").

Plaintiffs try to fashion an environmental injury by arguing that Risk Rating 2.0 somehow discourages flood mitigation, which would make future floods more likely to damage homes and businesses, causing financial losses. *See* Pls.' Opp'n 15. That the NFIP may relate to "the utilization of land," Pls.' Opp'n 14 (quoting 42 U.S.C. § 4002(a)(2)), however, does not render Plaintiffs' injury an

---

[2] The first assertion is irrelevant because the level of Community Rating discount is set by the Community Rating System program, separate and apart from Risk Rating 2.0. *See, e.g.*, 42 U.S.C. § 4022(b); FEMA, *NFIP Community Rating System Coordinator's Manual* (2017), https://perma.cc/879C -23Y2. The second assertion is erroneous because Risk Rating 2.0 takes into account comprehensive levee data. Defs.' Mem. in Support of Their Mot. to Dismiss at 12, 14–15 & n.12, *Louisiana v. DHS*, No. 2:23-CV-01839, ECF No. 47-1. And the third and fourth assertions are irrelevant because the rate for Plaintiffs' policy, which covers a severe repetitive loss property, is established by statute. *See* Maurstad Decl. ¶ 40.

environmental one. *See Ecosystems Inv. Partners v. Crosby Dredging, LLC*, 729 F. App'x 287, 296 (5th Cir. 2018) (rejecting NEPA claim because plaintiff's "clearest assertion of injury" related to "its pocketbook not the environment."). The two Endangered Species Act cases that Plaintiffs rely on to connect environmental and economic injuries, *see* Pls.' Opp'n 14–15 (citing *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1139 (11th Cir. 2008); *Fla. Key Deer v. Stickney*, 864 F. Supp. 1222, 1224 (S.D. Fla. 1994)), do not help Plaintiffs either. *Paulison* is not a standing case at all; the cited portion of that case concerns whether, as a substantive matter, a provision of the Endangered Species Act requiring consultation with the Fish and Wildlife Service applies to FEMA's administration of the NFIP. *See Paulison*, 522 F.3d at 1141–44. And *Stickney* is not a *statutory* standing case; the district court held that those plaintiffs established *Article III* standing to bring their Endangered Species Act claim because they "actually live in or visit Big Pine Key and the surrounding area, enjoy the existence of the Key deer in the wild, and intend to continue such activities in the future." 864 F. Supp. at 1225.

## IV.    The Court Lacks Jurisdiction Over Plaintiffs' Takings Clause Claim

Rather than contend with the "significant jurisprudence" requiring Plaintiffs to identify an explicit waiver of sovereign immunity to bring their takings claim, Plaintiffs make a novel, last-ditch argument that "the right to compensation itself contains a waiver of sovereign immunity." Pls.' Opp'n 15 (relying on *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987)). The Court should reject this argument out of hand. Such a holding would undermine the well-established requirement for an explicit waiver. And the cherry-picked *First English* reference to the "self-executing character of the constitutional provision with respect to compensation" merely reflects that the obligation to pay compensation arises as soon as a taking occurs. In fact, since *First English*, the Supreme Court has confirmed that the "self-executing" nature of the Fifth Amendment does not displace "the standard procedure for bringing such claims" under the Tucker Act. *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2170, 2172 (2019).

Because Plaintiffs have not identified an express waiver of sovereign immunity, their Takings Clause claim should be dismissed for lack of jurisdiction.

## V.       In the Alternative, Plaintiffs Fail to State a Takings Clause Claim

Plaintiffs' Takings Clause claim fails for the additional, independent reason that Plaintiffs have not plausibly pleaded the elements of such a claim. Plaintiffs must identify a valid property interest that has been taken. *See Ruckelshaus v. Monsanto Corp.*, 467 U.S. 986, 1000 (1984). But Plaintiffs do not attempt to argue that they hold a property right in the availability of federally-subsidized flood insurance; rather, their only asserted property interest is their homes. *See* Pls.' Opp'n 16.

To the extent that Plaintiffs assert a physical taking, Plaintiffs do not allege that the United States has taken physical possession of their home; indeed, Plaintiffs acknowledge that they still own and use their home. *See, e.g.*, Pls.' Opp'n 16 ("*If* they are unable to afford flood insurance, a requirement of their mortgage company, they *will* lose their home" (emphasis added)). Speculation about losing their home does not establish a valid property interest either. *See Stueve Bros. Farms, LLC v. United States*, 737 F.3d 750, 754 (Fed. Cir. 2013) (holding that "possibility of future flooding does not effect a physical taking of a flowage easement in the absence of actual flooding").

For the same reasons, Plaintiffs also fail to plead facts supporting a regulatory taking (i.e., that Risk Rating 2.0 "denies all economically beneficial or productive use of the land"). *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). Because Plaintiffs continue to live in and use their home, they come nowhere close to showing "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Id.* at 1017.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated:  January 30, 2024                                        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

LESLEY FARBY
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Yoseph T. Desta*
YOSEPH T. DESTA
(CA Bar # 332179)
BENJAMIN TAKEMOTO
(DC Bar # 1045253)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-3080
Email: yoseph.t.desta@usdoj.gov

TODD KIM
Assistant Attorney General
Environment & Natural Resources
Division

KRYSTAL-ROSE PEREZ
(TX Bar # 24105931)
LAURA DUNCAN
(Tx Bar # 24092366)
Trial Attorneys
United States Department of Justice
Environmental & Natural Resources
Division
P.O. Box 7611, Ben Franklin Station,
Washington, D.C. 20044
Tel: (202) 305-0486
Email: krystal-rose.perez@usdoj.gov

*Counsel for Defendants*

13

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2024, the foregoing was filed electronically through ECF/CM.  On this same date, electronic service will be made to all counsel of record through the Court's ECF/CM system.


*/s/ Yoseph T. Desta*
YOSEPH T. DESTA
Trial Attorney, U.S. Department of Justice